In the Matter of INVESTORS SECURI-TY CORPORATION, Bankrupt.

Thomas P. RAVIS, Esq., Trustee for Investors Security Corporation, Plaintiff,

v.

Benjamin J. DAY, Defendant.

Bankruptcy No. 75–1036.

United States Bankruptcy Court, W. D. Pennsylvania.

Aug. 1, 1980.

See also, Bkrtcy., 6 B.R. 415.

James E. White, Stevens, Clark, Laubach & Semple, Pittsburgh, Pa., for trustee.

Jerome M. Meyers, Pittsburgh, Pa., for claimant.

## MEMORANDUM OPINION

GERALD K. GIBSON, Bankruptcy Judge.

Presently pending before the Court is the objection of Benjamin J. Day to the trustee's disallowance of his claim brought pursuant to the provisions of the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa *et seq.* (SIPA) (reference throughout this opinion is to the text of the Act prior to the SIPA Amendments of 1978, Pub.L.No.95–283, 92 Stat. 249). The trustee determined that Day was not a "customer" of Investor Security Corporation (the Debtor), as defined in SIPA § 6(c)(2)(A)(ii), 15 U.S.C. § 78fff(c)(2)(A)(ii).

## I. *Introduction*

Upon application of the Securities Investor Protection Corporation (SIPC), United States District Judge Daniel J. Snyder, Jr. found that the customers of the Debtor were in need of the protection afforded under the SIPA and, pursuant to 15 U.S.C. § 78eee(b)(3), appointed Thomas P. Ravis, Esq. as trustee for the liquidation of the Debtor. On September 26, 1975, by order of Judge Snyder, the liquidation proceeding of the Debtor was referred to this Court.

In addition to Day's customer claim form dated December 10, 1975, Trustee Ravis received one such form signed by Wade Moore, claiming a $30,000 cash balance. He also received a general creditor claim form signed by Moore, claiming a $30,000 cash balance funded by a personal check of William H. Brown, who was president and principal stockholder of the Debtor. At trial the parties agreed, however, that Day and Moore were both claiming the same security or its cash value, and that their claims would be resolved in this proceeding. The discussion that follows will not address the rights of Day and Moore *inter se* except to the extent that it is relevant to the determination of the proper application of SIPA.

Having heard the evidence at trial and considered the contentions of counsel, the Court is now prepared to adjudicate the matter and enters the following:

## II. *Findings of Fact*

On December 16, 1975, Trustee Ravis received the customer claim form of Benjamin J. Day, which claimed alternatively $40,000 plus interest or unidentified securi-

ties of a value of $40,000. In a notice of his disallowance of Day's claim, mailed January 14, 1976, Ravis stated that the denial was based upon his determination that the claim was substantiated solely by documents showing a transaction with Wade Moore, individually, and/or Wade Moore Investment Corporation. Ravis further stated that Day's claim was not substantiated by the Debtor's books and records which contained no reference to cash being held for Day's benefit.

Benjamin Day is a resident of Murrysville, Pennsylvania. His personal background suggests that he is unsophisticated and inexperienced in securities transactions. Day has a high school education and lives with his wife and three of his seven children in a small trailer park which he acquired some time ago for $5,000. Day's possessions before he became involved with the Debtor consisted of the trailer park, a small cottage in the mountains, and personal savings in the form of a bank certificate in the amount of $10,000. Day's annual net income from the trailer park ranges from $4,000 to $8,000.

During the latter part of 1973, as the result of seeing a newspaper advertisement for an offering of Duquesne Light stock, Day became interested in investing his $10,000 savings in the stock. Richard Tracy, a friend of Day's who was a bartender and part–time security salesman, introduced Day to Wade Moore at Moore's office in Penn Hills Township. The meeting took place just prior to Moore's moving into the Debtor's offices in Monroeville, Pennsylvania, but after Moore had transferred his license to sell securities to the Debtor. Although Day went to Moore for the purpose of buying Duquesne Light stock, Moore convinced him to invest his $10,000 savings in a proposed corporation, Playmor Courts. At that meeting, Day was shown a brochure on the tennis court proposal and was told that he would receive approximately a 23% return on his investment. Day agreed to purchase a 10% interest, but the transaction was neither formalized nor completed at that time. He later asked for and was permitted to buy a 20% interest in the project for $40,000.

Beginning in October, 1973, and at all times material to this case, Wade Moore was not registered with any other broker–dealer. Prior to his registering with the Debtor, Moore had formed two separate corporations: (1) Wade Moore Investment Corporation, a now bankrupt corporation which is not connected by any acts of its agents to the transactions involved in this case; and (2) Moore Investment Corporation, from which Moore resigned as president in order to transfer his license to sell securities to the Debtor.

The testimony adduced at trial establishes the creation of a business relationship between Day and Moore in which Day reasonably supposed, using due diligence and discretion, that Moore was acting at all times as the agent of the Debtor. During the course of their business transactions, Moore never held himself out as being in business for himself. Except for the first meeting between Day and Moore, all of the meetings and transactions involved in this case occurred on the premises of Investors Security Corporation at the Monroeville Mall, Monroeville, Pennsylvania. Wade Moore used the facilities of the Debtor and led Day to believe that he was authorized to engage in all types of securities transactions as an agent of the Debtor.

The Debtor represented to Day that Moore was acting for it. It employed Moore to conduct the business of a stockbroker from its offices and licensed him. There were no signs indicating that Moore was in any way acting independently of the Debtor.

Moore did not have the Debtor's express authority to sell Day an interest in Playmor Courts. The debtor had knowledge, however, of Moore's involvement with the Playmor project. For example, it returned to John R. Mellett and Associates, Inc., a firm of consulting engineers, a bill for services rendered in regard to tennis courts explaining that it "had no past interest in tennis courts." These services had been performed at Moore's instigation. Yet the

Debtor did not attempt to learn the identity of others Moore was presenting himself to as its agent.

After several meetings at the office of the Debtor, Day gave $10,000 to Moore on March 12, 1974, as a first installment toward his purchase of a 20% interest in Playmor Courts. On March 15, 1974, Day signed a demand note for $30,000, payable to Wade Moore or Louis J. Dell'Aquila. Moore and Day entered into a written agreement on March 29, 1974, that provided for Day's purchase of 20% of the stock of Playmor Courts. The agreement also provided for the deposit of Day's $40,000 into an escrow account in the names of Moore and Dell'Aquila. Delivery of the $40,000 to Playmor Courts was conditioned upon the occurrence of all of the following events:

a. Duly establishing a corporation

b. An option to purchase not less than two (2) acres of land properly zoned, that can be utilized for the purpose of establishing a public tennis club.

c. A tentative financial commitment sufficient to fund the building of said public tennis club.

Although the demand note was not called, Day delivered a personal check for $30,000 to Moore on August 1, 1974, after negotiating a $30,000 mortgage on his trailer park through Irwin Bank & Trust.

It is clear from the testimony that Day was under the impression that his $40,000 was in an escrow account at Friendship Federal Savings & Loan Association. But this was not so. Contrary to the terms of their agreement, Moore delivered $15,000 to the escrow account at Friendship Federal, and $25,000 to Bill Brown, president of the Debtor, on August 25, 1975, in connection with a bond issue transaction between Brown and Aiello, Rea & Co., Inc., another Pittsburgh broker–dealer. Brown later lied to Moore that the $25,000 had appreciated to $32,000 as a result of that transaction, and that the funds were used to purchase two $100,000 certificates of deposit issued by Pittsburgh National Bank. In fact, Brown had purchased a certificate of deposit through Pittsburgh National Bank, but

he had purchased it on May 28, 1974, which was prior to his receipt of the $25,000 from Moore on August 23, 1974. Brown placed the $25,000 in his own personal checking account and eventually spent it. No other certificates of deposit were ever purchased in the names of William Brown, Investors Security Corporation, or Investco, the registered fictitious name of Investors Security Corporation. Moore spent the $15,000 held in escrow for the Playmor Courts venture.

During the later part of 1974, Moore informed Day that the tennis club project had failed to materialize. He advised Day that he would either return his money or invest it in Potter County Hospital Authority municipal bonds yielding approximately 9% interest per annum. Day authorized Moore to purchase the municipal bonds. Moore advised Brown that he was going to buy the Potter County bonds for Day, and requested funds to pay the purchase price. Brown issued a check to Moore drawn upon the personal account into which he had deposited Day's $25,000.

Because of prior difficulties with the Securities and Exchange Commission, Investors Security Corporation was not permitted to make trades for customers except through other registered securities dealers. Accordingly, the attempted purchase of Potter County bonds was made through Cowan & Co. of New York. Although Cowan & Co. purchased the bonds, they were never delivered to the Debtor, because the Debtor never tendered payment. Brown's $25,000 check disappeared, and periodic statements of Brown's account do not reflect a sufficient balance for the bank to have honored the check at any time.

### III. *Discussion*

#### A. *The Meaning of "Customer" Under the SIPA*

SIPA was enacted to provide protection for "customers" of a bankrupt broker–dealer by giving them preference over general creditors, SIPA § 6(c)(2)(B), 15 U.S.C. § 78fff(c)(2)(B). If the Debtor's assets in a "single and separate fund", established in SIPA § 6(c)(2)(B), 15 U.S.C. § 78fff(c)(2)(B),

are insufficient, SIPC will advance up to $50,000.00 per customer, if the claim is one for securities, or up to $20,000, if the claim is one for cash. SIPA § 6(f)(1)(A), 15 U.S.C. § 78fff(f)(1)(A).

The definition of "customer" in SIPA was based upon the definitional language of that term found in section 60(e)(1) of the former Bankruptcy Act, 11 U.S.C. § 96(e)(1). Section 60(e) was enacted to cure inequities which had previously arisen in the treatment of certain securities customers of broker–dealers in bankruptcy. H.R.Rep.No.1409, 75th Cong., 1st Sess. 31 (1937); Hearings on H.R.6439 before the House Comm. on the Judiciary, 75th Cong., 1st Sess. 127–131 (1937); *See Tepper v. Chichester*, 285 F.2d 309, 311 (9th Cir. 1960); *In re McMillan, Rapp & Co.*, 123 F.2d 428 (3d Cir. 1941); 3 *Collier on Bankruptcy*, ¶ 60.72 (15th ed. 1975). While much of the definitional language of "customer" in SIPA is taken nearly verbatim from Section 60(e)(1), the term also includes, *inter alia*, persons who have deposited cash with the debtor for the purpose of purchasing securities.

SIPA § 6(c)(2)(A)(ii) defines "customers" as follows:

> 'customers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchase, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, *and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities*, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor; . . .

15 U.S.C. § 78fff(c)(2)(A)(ii) (emphasis added). The definition of security found in section 78c(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, which is controlling here by virtue of SIPA § 2, 15 U.S.C. § 78bbb, provides that the term security means "preorganization certificate or subscription . . .". 15 U.S.C. § 78c(a)(10).

In applying the SIPA definition of "customer" in this case, the Court's primary inquiry is whether Day entrusted cash with the Debtor for the purpose of purchasing the preorganization interest in Playmor Courts. Essential to this determination is whether Day deposited funds with the Debtor in such a manner that a fiduciary relationship between himself and Investors Security Corporation was created. *See, SIPA v. Executive Securities Corp.*, 556 F.2d 98 (2d Cir. 1977); *SEC v. F. O. Baroff*, 497 F.2d 280 (2d Cir. 1974).

Both the case law and the legislative history of SIPA have considered the concept of "customer" both as investor and purchaser/trader to be of primary importance. *See, e. g., SEC v. Packer, Wilbur & Co.*, 498 F.2d 978, 984 (2d Cir. 1974); *SEC v. Alan F. Hughes, Inc.*, 461 F.2d 974, 977 (2d Cir. 1972); *SEC v. Kenneth Bove & Co.*, 378 F.Supp. 697, 700 (S.D.N.Y.1974). The House Report on SIPA states that the Act's main purpose is "to provide protection for *investors* if the broker–dealer with whom they are doing business encounters financial troubles." H.Rep.No.91–1613, 91st Cong., 2d Sess. (1970), 3 U.S. Code Congressional and Administrative News, 91st Cong., 2d Sess., p. 5255 (1070) (emphasis added).

This consideration distinguishes the case at bar from those where money is delivered to a person acting in his individual capacity and not as an agent for a broker–dealer. *See, Securities Investor Protection Corp. v. Seed Capital Corp.*, 78 Civ. 878 (S.D.N.Y. 1976); *Securities Investor Protection Corp. v. Morgan Kennedy & Co.*, 73 Civ. 1057 (S.D.N.Y.1976). Significantly, the special consideration of "customer" as investor and purchaser–dealer also distinguishes this

case from those where the financial relationship between the parties involves a loan to the broker–dealer, and it has the attributes of an ordinary debtor–creditor transaction, rather than the fiduciary characteristics of a broker–customer relationship. *SEC v. Executive Service Corp.*, 423 F.Supp. 94 (S.D.N.Y.1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977).

### B. The Apparent Authority of Wade Moore

This Court holds that Day was a "customer" of the Debtor by virtue of his entrusting $40,000 with Investors Security Corporation, through its agent Wade Moore, for the purpose of purchasing the preorganization interest in Playmor Courts. The determination of Wade Moore's status as agent for the Debtor, therefore, is critical to the Court's adjudication. Although the facts reveal that Moore did not have express authority to bind the Debtor, application of the doctrine of apparent authority establishes that Moore acted at all times material to this case as the agent of the Debtor.

▪ Apparent authority is that authority which, although not actually granted, the principal presents his agent as possessing. *Simon v. H. K. Porter Company*, 407 Pa. 359, 364, 180 A.2d 227, 230 (1962). The authority of an agent of a corporation "may be presumed from his position and the nature of the act." Restatement, Agency, Section 49, comment b, cited with approval in *O'Donnell v. Union Paving Co.*, 121 Pa. Super.Ct. 68, 72, 182 A. 709 (1936). In its discussion of apparent authority, the Court in *East Girard Savings & Loan Association v. Houlihan*, 373 Pa. 578, 97 A.2d 23 (1953), stated that:

> [i]f the principal puts one into, or knowingly permits him to occupy, a position in which, according to the ordinary experience and habits of mankind, it is usual for the occupant to have authority of a particular kind, anyone having occasion to deal with one in that position is justified in inferring that the person in question possess such authority, unless the contrary is made known.

The crucial test in applying the doctrine of apparent authority is whether a person "of ordinary prudence, diligence and discretion would have a right to believe that the agent possessed the authority he purported to exercise". *Apex Financial Corp. v. Decker*, 245 Pa.Super.Ct. 439, 443, 369 A.2d 483 (1976).

▪ The Debtor manifested to Day that Moore had authority to sell him the preincorporation interest in Playmor Courts on its behalf. It employed Moore to act as a general sales representative for the sale of securities, and represented to the public that he was a man authorized to engage in all sorts of securities transactions as its agent. Day reasonably believed that Moore had the authority to sell the 20% interest in Playmor Courts. Moreover, the Debtor even had knowledge of Moore's Playmor solicitation, but did not attempt to learn whom Moore was presenting himself to as its agent. Thus, it negligently permitted Moore to cause third parties to believe in his authority as its agent, and is bound by his acts. *Reifsnyder v. Dougherty*, 301 Pa. 328, 152 A. 98 (1932).

### C. The Customer–Broker Relationship between Day and the Debtor

▪ The complex series of transactions surrounding Day's entrustment of $40,000 with the Debtor, through Moore, establishes a fiduciary relationship between Day and the Debtor. Contrary to the arguments set forth by the SIPC and Trustee Ravis, this case does not involve a commercial agreement whereby Day became an active co-venturer, as distinguished from a "passive investor". Nor does it involve a loan by Day to the Debtor, creating a typical debtor–creditor relationship.

Pursuant to the specific terms of the written agreement between Day and the Debtor, by its agent Moore, Day assumed no active duties in the formation of Playmor Courts. In fact, Day's $40,000 was to have been left untouched in an escrow account under the control and authority of the Debtor until the corporation was duly established, an option to purchase suitable

land was acquired, and funding of the building was obtained. Only after these specific conditions precedent occurred was Day's purchase of the 20% interest in Playmor Courts to have been effective. It is clear, therefore, that Day entrusted his $40,000 with the Debtor for the purpose of purchasing an interest in Playmor Courts.

Moreover, subsequent events in the tangled story of Day's $40,000 support the finding of a customer–dealer relationship between him and the Debtor. After the tennis club investment failed to materialize, Moore told Day that he could either have his money back, or that Moore would invest it for him in municipal bonds. Day's role was never more than a passive investor. In fact, Day had no idea, until Moore told him, that the tennis court project had failed, nor was he aware that the Debtor had expended his funds from the escrow account. On the other hand, the Debtor's recommendation, by its agent Moore of an alternative investment in municipal bonds, is consistent with its role as a broker–dealer.

■ The trustee is clearly erroneous in his assertion that Moore's failure to open a formal Day account precludes "customer" treatment. Customer status under SIPA is not dependent upon official documentation in the Debtor's books. Additionally, the trustee's argument that Day did not entrust money with the Debtor because Moore and Brown later converted the escrow funds for their own use is without merit. Determinative here is Day's delivery of the $40,000 to the Debtor, and not the Debtor's subsequent mishandling of the funds. It would strike at the core of customer protection to hold that the misuse by the Debtor's agents of monies entrusted to it by its customers defeats customer recovery under the SIPA. Day must prove only that he entrusted cash with the Debtor for the purpose of purchasing securities. SIPA § 6(c)(2)(A)(ii), 15 U.S.C. § 78fff(c)(2)(ii). Day has clearly met his burden.

D. *Limitation of Recovery Pursuant to SIPA § 6(f)(1)(A)*

■ Customer status under SIPA entitles a claimant to an advancement of limited SIPC funds if the "single and separate fund" established by SIPA § 6(c)(2)(B) is insufficient to satisfy ratably the "net equity" of customer claims. 15 U.S.C. § 78fff(c)(2)(B). Pursuant to the distribution scheme outlined in SIPA § 6(f)(1)(A), 15 U.S.C. § 78fff(f)(1)(A), SIPC will advance up to $50,000 per customer if the claim is one for securities, or up to $20,000 if the claim is one for cash.

SIPA § 6(c)(2)(A)(iv) defines a customer's "net equity" as

the dollar amount thereof determined by giving effect to open contractual commitments completed as provided in subsection (d) of this section, by excluding any specifically identifiable property reclaimable by the customer, and by subtracting the indebtedness, if any, of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated, by sale or purchase on the filing date, all other securities and contractual commitments of the customer . . .

15 U.S.C. § 78fff(c)(2)(A)(iv). The court in *SEC v. Aberdeen Securities Co.*, 480 F.2d 1121 (3d Cir. 1973), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973), stated that "[t]he customer's net equity consists of both his cash balance and the securities account valued as of the filing date. . . . [T]he 'dollar amount' of a customer's account includes his cash which the broker has, or should have been holding." *Id.*, at 1127. Day's "net equity" may be simply computed in this case as $40,000, because the Debtor should have been holding on September 15, 1975, the filing date of this proceeding, either Day's $40,000 in the escrow account, or $40,000 worth of Potter County municipal bonds. Day's entitlement to SIPC funds is limited to only $20,000 pursuant to SIPA § 6(f)(1)(A), since his loss resulted from cash deposited with the Debtor.

Day argues that his claim is one for securities, thereby entitling him to SIPC funds in the full amount of his $40,000 loss. He contends that he invested in securities–

namely the subscription agreement in Playmor Courts–and that he subsequently authorized the Debtor to purchase the Potter County Bonds. He maintains that his claim for securities is further supported by the fact that the Debtor, through its agent Moore, ultimately ordered the purchase of the Potter County bonds on Day's behalf. Day argues that he was led to believe that the Debtor had in fact purchased the bonds, and that the failure of purchase was caused by the Debtor's misuse of the money.

█ The Court finds Day's assertions without merit. Only after a series of conditions precedent set out in specific terms in a written agreement between him and the Debtor occurred was his purchase of the interest in Playmor Courts to become effective. These conditions, however, never occurred. And the $40,000 entrusted to the Debtor by Day was never used to purchase the 20% interest in Playmor Courts. In any event, a bare authorization by Day to the Debtor to purchase bonds for him is insufficient to qualify the claim as one for securities. 15 U.S.C. § 78fff(f)(1)(A). Determinative here is the fact that the Debtor never tendered payment for the purchase of the bonds. Day's claim is, therefore, one only for cash.

█ Day further argues that the Debtor has a duty to deliver the Potter County bonds to him because of an "open contractual commitment," pursuant to SIPA § 6(d), 15 U.S.C. § 78fff(d). SIPA § 6(d) provides in pertinent part:

Completion of open contractual commitments. The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of the debtor's business and which were outstanding on the filing date—

(1) in which a customer had an interest, . . . For purposes of this subsection . . . (i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction . . ."

15 U.S.C. § 78fff(d). The duty of a trustee to complete open contractual commitments was strictly limited to transactions between the Debtor and another broker–dealer in *SEC v. Aberdeen Securities, Co., supra,* 480 F.2d at 1125. In *Aberdeen,* the Third Circuit stated:

The District Court ruled that undertakings involving only the Debtor and his customers are not the contractual commitments contemplated by subsection (d), and therefore the Trustee could not be forced to satisfy this claim in kind. We agree with the conclusion of the learned Court below.

Our review of the legislative history of the Act and the testimony of both the Senate and the House convinces us that the open contractual commitments covered by § 6(d) are those between the debtor and another broker–dealer.

*Id.* The transaction between the Debtor and Cowan & Co. is not a transaction between the Debtor and another broker–dealer as contemplated by SIPA § 6(d), because they were parties to a clearing arrangement entered into on July 17, 1973, as amended July 26, 1973. Pursuant to that agreement, Cowan & Co. executed all securities trades for the Debtor's customers, issued confirmations to them, held both cash credit balances and securities for them, and issued periodic account statements to them. Cowan & Co.'s actions on behalf of the Debtor pursuant to this arrangement preclude the inter–broker transaction required under SIPA § 6(d).

Based on the foregoing, the Court concludes that Day was a "customer" of the Debtor pursuant to SIPA § 6(c)(2)(B), 15 U.S.C. § 78fff(c)(2)(B), and that Day's loss resulted from cash deposited with the Debtor, entitling him to a maximum award of $20,000, SIPA § 6(f)(1)(A), 15 U.S.C. § 78fff(f)(1)(A). It is therefore Ordered and Decreed that the trustee advance Day $20,000 of SIPC funds as partial relief of

his $40,000 loss. Day must claim as a general creditor the $20,000 balance.