**In re SWINK & COMPANY, INC., Debtor.**

**CITY OF ELKINS, Plaintiff,**

**v.**

**Charles Darwin DAVIDSON, Trustee, Defendant.**

**Bankruptcy No. 90–4106M.**
**Adv. No. 90–4089.**

United States Bankruptcy Court,
E.D. Arkansas, W.D.

June 29, 1992.

Richard C. Downing, Little Rock, Ark., for plaintiff.

Gary P. Barket, Stephen L. Gershner, Little Rock, Ark., for trustee/defendant.

Charles D. Davidson, Little Rock, Ark., Chapter 7 Trustee.

David E. Smith, Benton, Ark.

Robbye R. Waldron, Houston, Tex.

Richard Smith, Little Rock, Ark.

Greg Stephens, N. Little Rock, Ark.

Richard D. Taylor, Little Rock, Ark.

Thomas Carroll, Little Rock, Ark.

Ben Arnold, Little Rock, Ark.

MacLeish Roderick, Boston, Mass.

David J. Kellerman, Mark S. Fenzel, Middleton & Reutlinger, Louisville, Ky.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On January 17, 1990, an involuntary petition was filed against Swink & Company (Swink), and on February 23, 1990, an order was entered adjudicating Swink a debtor under chapter 7 of the United States Bankruptcy Code. Charles Darwin Davidson, Esq., (trustee) was appointed the chapter 7 trustee. On June 29, 1990, the City of Elkins (Elkins) filed a complaint to determine priority status alleging that it is a "customer" pursuant to 11 U.S.C. § 741 and, therefore, entitled to a priority status pursuant to 11 U.S.C. § 752.

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and the Court has jurisdiction to enter a final judgment in the case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

Swink was a securities broker-dealer with its principal place of business located in Little Rock, Arkansas. Swink was registered with the Securities and Exchange Commission and the Arkansas Securities Department. Elkins is a municipal corporation located in West Virginia. In June 1989, Elkins executed a "Customer's Agreement" with Swink as the broker-dealer and Elkins as the customer for the purpose of buying and selling securities. The

customer agreement authorized Swink to buy and sell securities for Elkins and denoted Elkins as a "customer" in this agreement. In August 1989, Elkins and Swink executed a "Master Repurchase Agreement" in anticipation of engaging in repurchase agreements involving securities. Both documents required Elkins to maintain a margin account as collateral for credit transactions involving the sale or purchase of securities.

According to Glyn Wyland, the City Treasurer of Elkins, the investment activities of Elkins included the purchase of securities such as U.S. treasury bonds and U.S. government agency securities such as mortgage-backed securities issued by the Government National Mortgage Association (GNMA) and the Federal Home Loan Mortgage Corporation (FHLMC).[1] Elkins purchased securities on a trade date on credit with a settlement date in the future. Elkins would then attempt to "match" or "pair up" a sale of the same securities with the same settlement date. If the market price of the securities increased between the trade date and settlement date, Elkins would make a profit on the transaction. Conversely, if the market price of the securities decreased, Elkins would suffer a loss.

The two series of transactions involved in this adversary proceeding involve securities issued by FHLMC, known as pass through certificates. According to the testimony of Donald Gates, a former employee of Swink, these types of FHLMC securities are book-entry or uncertificated securities, which are maintained through the Federal Reserve book-entry system. Swink and Elkins entered into the two series of transactions between August and December, 1989. Each series commenced by Elkins purchasing a FHLMC security and, prior to the settlement date, selling the security back to Swink subject to an agreement by Elkins to repurchase the security at a stated price. Swink would simultaneously enter into almost identical transactions with Dain Bosworth (Bosworth), a security broker located

in Minneapolis, Minnesota, which involved the same securities.

More specifically, the two transactions were as follows. On July 20, 1989, Elkins purchased a $2,000,000 par value 10% FHLMC security whose pool number was 360064. The settlement date for this transaction was August 17, 1989. As the settlement date approached, the market price of the securities had decreased and Elkins was anticipating a loss on any attempted match. In order avoid a loss on the transaction, Elkins agreed to sell the $2,000,000 FHLMC security to Swink pursuant to a repurchase agreement. Between August 17 and December 27, 1989, Elkins repurchased and resold the same security to Swink on several occasions.

The second series of transactions began on December 4, 1989, when Elkins purchased a $4,000,000 par value 10½% FHLMC security whose pool number was 535754. The settlement date for this transaction was December 19, 1989. After the trade date on December 4, 1989, the market price of the securities decreased, and, as in the first series of transactions, Elkins sold the $4,000,000 bonds to Swink under a repurchase agreement, agreeing to buy the bonds back on December 31, 1989.

As a result of the two series of transactions, Elkins has a claim against Swink in the total sum of $201,625.37. Elkins's claim is based on the following two components: (1) the November 1989 principal and interest due on the first transaction involving pool number 360064 in the amount of $27,112.81 and (2) the balance of its margin account, which is the net result of the series of trade transactions in the amount of $174,512.56. The amount of Elkins' claim is not disputed.

## DISCUSSION

The issue to be determined is whether a participant in a repurchase agreement with a broker-dealer is a "customer" pursuant

---

**1.** GNMA is a U.S. Government-owned corporation that approves the issuance of mortgage-backed securities that are guaranteed by the U.S. Treasury. Ginnie Mae is the colloquial name for mortgage-backed securities issued by GNMA. FHLMC is a federal agency that issues mortgage-backed securities known as Participation Certificates. Freddie Mac is the colloquial name for mortgage-backed securities issued by the FHLMC.

to 11 U.S.C. § 741(2) and, therefore, entitled to the priority status granted a customer under 11 U.S.C. § 752.

Elkins argues that it meets the definition of "customer" as provided in 11 U.S.C. § 741 and, therefore, is entitled to a priority status as a customer. More specifically, Elkins alleges that it acquired securities from Swink in the ordinary course of Swink's business as a broker-dealer, that the transactions involved the purchase and sale of securities, and that the transactions created a fiduciary relationship between Swink and Elkins.

The trustee argues that Elkins has not met the elements of 11 U.S.C. § 741 because the securities involved in the two series of transactions were not "held" by Swink for Elkins, but were sold to third parties pursuant to repurchase agreements. According to the trustee's argument, the repurchase agreement transactions do not qualify for the customer protection afforded by 11 U.S.C. §§ 741–752.

Bankruptcy cases involving securities broker-dealers are administered under the provisions of 11 U.S.C. §§ 741–752, as well as other applicable sections of Title 11. A liquidation under 11 U.S.C. §§ 741–752 is independent from a proceeding pursuant to 15 U.S.C. § 78eee(b)(1) of the Securities Investor Protection Act of 1970 (SIPA).[2] The analysis used to determine whether a claimant is a customer for purposes of a bankruptcy proceeding is analogous to the analysis used in SIPA proceedings because the definition of the term "customer" is substantially the same in both instances.

The Bankruptcy Code defines a "customer" to include:

(A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity—

(i) for safekeeping;

(ii) with a view to sale;

(iii) to cover a consummated sale;

(iv) pursuant to a purchase;

(v) as collateral under a security agreement; or

(vi) for the purpose of effecting registration of transfer; and

(B) entity that has a claim against a person arising out of—

(i) a sale or conversion of a security received, acquired or held as specified in subparagraph (A) of the paragraph; or

(ii) a deposit of cash, a security or other property with such person for the purpose of purchasing or selling a security.

11 U.S.C. § 741(2).

The SIPA statute defines a "customer" as follows:

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities[.]

15 U.S.C. § 78111(2). Therefore, the claimant's status as a customer can be based on case law involving both SIPA and bankruptcy proceedings.

Elkins satisfies the literal definition of a customer pursuant to 11 U.S.C. § 741. Elkins has a claim for securities or cash "received, acquired, or held" by Swink in the ordinary course of its business; the securities or cash was received, acquired,

---

**2.** The Securities Investor Protection Corporation (SIPC) elected not to become a party to this action. *See* 15 U.S.C. 78eee(a)(3). *See also Holmes v. SIPC,* —— U.S. ——, 112 S.Ct. 1311, 1314, 117 L.Ed.2d 532 (1992); *In re Brittenum & Assoc., Inc.,* 82 B.R. 64, 65 (Bankr.E.D.Ark. 1987).

or held "from or for the securities account" of Elkins; and the securities or cash have been received, acquired, or held by Swink either for safekeeping, with a view to sale, as collateral or for effecting transfer.[3] However, "[i]t may not be enough ... merely to satisfy the literal requirements.... Courts have generally taken a restrictive view of Congress' intended scope of 'customer' protection." *Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Management Corp.),* 67 B.R. 557, 600 (D.N.J.1986).

■ Courts have consistently emphasized two factors as necessary to a determination that a claimant is a customer. First, the transaction must have been related to investment, trading, or participation in the securities market. Second, the transaction must have arisen out of the type of fiduciary relationship that generally characterizes the relationship between a broker-dealer and its customer. *Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Management Corp.),* 67 B.R. at 600 (citing *SIPC v. Wise (In re Stalvey & Assoc., Inc.),* 750 F.2d 464 (5th Cir.1985) and *SEC v. F.O. Baroff Co., Inc.,* 497 F.2d 280, 284 (2d Cir.1974)). *Accord In re Hanover Square Sec.,* 55 B.R. 235, 238–40 (Bankr.S.D.N.Y.1985); *In re John Muir & Co.,* 51 B.R. 150, 152 (Bankr.S.D.N.Y. 1985); *Ravis v. Day (In re Investors Sec. Corp.),* 6 B.R. 420, 424 (Bankr.W.D.Pa. 1980). More precisely, the Court in *Bevill, Bresler* focused on the following factors:

(1) whether the particular transactions were an integral part of the stockbroker's ordinary course of business;

(2) whether the stockbroker maintained computerized accounts for each of the Repurchase Agreements and Reverse Repurchase Agreements in which the purchases and sales as to said transactions were duly recorded in the same manner as outright purchases and sales;

(3) whether the securities underlying the various transactions were held by the stockholder pursuant to the purchase of the securities by the Repurchase Agreement and Reverse Repurchase Agreement participants;

(4) whether the underlying securities were acquired by the stockbroker with a view to their resale on the other side of a Repurchase Agreement transaction on a predetermined future date;

(5) whether the securities were received, acquired, or held pursuant to completed or contemplated purchase and sale transactions which were conducted through trading accounts maintained by the stockbroker for the various participants on each side of the Repurchase Agreement and Reverse Purchase Agreement transactions.

*Thomson McKinnon Sec., Inc. v. Residential Resources Mortgage Inv. Corp. (In re Residential Resources Mortgage Inv. Corp.),* 98 B.R. 2, 21–22 (Bankr.D.Ariz. 1989) (citing *In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. at 599–600).

The case of *Bevill, Bresler* is one of the first cases to consider whether a participant in a repurchase agreement transaction is a customer for SIPA proceedings. The court, in a lengthy and well-reasoned opinion, concluded that a repurchase participant is a customer. *Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. at 602. The Court observed as follows:

The Trustee and SIPC contend that claimants must have been trading *through* rather than *with* the bankrupt dealer in order to qualify as SIPA "customers." They argue that repo and reverse repo participants were dealing strictly *with* BBS, Inc., and that the ultimate success of their transactions was dependant upon the continued financial well being of BBS, Inc. rather than the strength of the underlying investment. Thus, they argue that repo and reverse repo participants are no different than ordinary creditors of a dealer who rely on the creditworthiness of the dealer

---

**3.** The record is not clear as to how the two series of transactions were financed; however, neither side argues that the securities were not delivered to Elkins in a manner authorized by law. Apparently the the securities were maintained by Bosworth or Swink on behalf of Elkins.

rather than the "vicissitudes of the particular market." *See, In re Co Petro,* 680 F.2d 566, 571–72 (9th Cir.1982).

This argument, however, is a gross oversimplification which ignores the nature and mechanics of the repurchase market, and must fail for two reasons. First, under the plain language of the statute, the term "customer" includes "any person with whom the debtor deals as principal" for its own account. 15 U.S.C. § 78111(2). Second, as in any securities transaction, the success of an investment in the repurchase market is directly related to market fluctuations in the underlying security. Reverse repo participants surrender securities for a fixed term during which the market value of the securities is subject to substantial fluctuation. If the market value decreases over the term of the reverse repo agreement, the reverse repo participant will have lost an important opportunity to sell the securities outright. If, on the other hand, the market value increases, he will not only have had the use of a large portion of the cash value of the securities, but will also be repurchasing a more valuable security at a price fixed at the outset of the transaction. Precisely the opposite risks and opportunities for reward attend to every repo transaction. Repo participants also have the opportunity to trade the securities during the term of the repo agreement, trades which no doubt carry their own risks and potential rewards. The risks and potential rewards associated with repo and reverse repo transactions are unquestionably *market-related* risks and rewards which are entirely distinct from and additional to any credit risk associated with the solvency of the broker as a financial intermediary.

The status of repo and reverse repo participants is thus markedly different than that of the stock lenders who were denied customer status in *Baroff* and *SIPC v. Executive Securities Corp.,* 423 F.Supp. 94 (S.D.N.Y.1976), *aff'd,* 556 F.2d 98 (2d Cir.1977). Unlike the stock lender in *Baroff,* the repo and reverse repo participants in the BBS, Inc. test cases were not contributing "to the capi-

tal of the broker-dealer," and did not become creditors of BBS, Inc. for reasons independent of investment and trading in an established securities market. 497 F.2d at 283–84. Nor is there any meaningful resemblance between the repo and reverse repo participants and a "commercial bank, trade creditor, landlord, equipment lessor, or any other party who relies on the ability of a business enterprise to repay a business loan." *Id.* at 284. Unlike the stock lenders in *Executive Securities,* the repo and reverse repo participants were investing and trading in securities through customer accounts maintained for them by BBS, Inc. 556 F.2d at 99.

*Id.* at 601–02 (emphasis in original).

This conclusion was followed in the case of *Thomson McKinnon Securities, Inc. v. Residential Resources Mortgage Investments Corp. (In re Residential Resources Mortgage Investments Corp.),* 98 B.R. 2, 21–22 (Bankr.D.Ariz.1989). Research does not disclose any case that declines to follow the rationale of *Bevill, Bresler.* Some cases, however, have distinguished the facts in *Bevill, Bresler* and have reached different results. *See Tew v. Resource Management (In re ESM Gov't Sec., Inc.),* 812 F.2d 1374, 1377 (11th Cir.1987) ("We agree with the holding in [*Bevill, Bresler* ], however, the facts of [this case] are distinguishable.")

■ Under the facts presented in this case, the analysis of the Court in *Bevill, Bresler* is applicable and Elkins is a customer within the meaning of 11 U.S.C. § 741. Swink and Elkins executed documents with Elkins designated as a customer and the parties contemplated a relationship of trading in the securities market as broker-dealer and customer, respectively. Elkins maintained a margin account to facilitate the various purchases of securities on credit. Swink maintained computerized accounts of all the transactions with Elkins, including the repurchase and reverse repurchase transactions. Elkins purchased the securities on credit with a settlement date in the future. Swink acted in a fiduciary capacity in its transactions with

Elkins. The substance of the relationship between Swink and Elkins remained the same during the course of time that Swink and Elkins engaged in repurchase transactions. The substance of the transactions between Swink and Elkins is not distinguishable from the transactions described in *Bevill, Bresler.*

Therefore, for the reasons stated, the trustee's objection to Elkins' claim of customer status is overruled. The City of Elkins is determined to be a customer with the meaning of 11 U.S.C. § 741 and is entitled to priority status pursuant to 11 U.S.C. § 752.

IT IS SO ORDERED.