**In re C.J. WRIGHT & COMPANY INCORPORATED, Debtor.**

**SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff,**

v.

**C.J. WRIGHT & COMPANY INCORPORATED, Defendant.**

**Adv. No. 91–100.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Dec. 27, 1993.

Jason B. Burnett and Lee S. Haramis, Jacksonville, FL, for claimants Austin, Manning, McCurdy and Seuntjens.

Dennis D. Camp, Ocala, FL, for claimants Camp, Hoit, Mathews, Schroeder and Stancliffe.

Roland and Loretta McKay, pro se claimants.

K. Rodney May, Orlando, FL, Gardner F. Davis, Jacksonville, FL, for trustee.

Stephen P. Harbeck, Washington, DC, for SIPC.

Michael Johnson, Ocala, FL, for claimant Shields.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon the objections of eleven claimants to the determination by the trustee to the status of their claims against the debtor in this liquidation proceeding conducted pursuant to the Securities Investor Protection Act ("SIPA"). 15 U.S.C. § 78aaa *et seq.* The trustee appointed pursuant to § 78eee(b)(3) denied claimants customer status and instead classified the claims as general creditor claims. The Court held hearings on the objections on July 27 and July 28, 1993. Upon the evidence presented, the Court enters the following findings of fact and conclusions of law:

### Findings of Fact and Stipulation as to other Matters

The trustee[1] and the claimants[2] entered into the following pre-trial stipulations as to fact and other matters.

### A. Basis of Jurisdiction.

The Court has jurisdiction over this action pursuant to 15 U.S.C. Section 78eee(b)(4),

---

1. SIPC is a party in interest and has the right to participate in this liquidation. 15 U.S.C. § 78eee(d). SIPC participated in the hearings held on the objection to trustee's determination of customer status. SIPC and the trustee's counsel submitted a Joint Post–Trial Memorandum in this proceeding. Thus all references to the trustee include SIPC as a party in interest.

2. Claimants Austin, Camp, Hoit, Manning, Mathews, McCurdy, Schroeder, Seuntjens, and Stan-

cliffe's counsel submitted joint Findings of Fact and Conclusions of law. Counsel for William and Edna Shields submitted proposed Findings of Fact and Conclusions of Law on behalf of the Shields which tracks the proposed findings submitted by the other claimants. Claimant McKay represented his own interest pro se. Each of these parties is included in the term claimants.

and pursuant to the Order of the United States District Court entered on April 24, 1991, removing this liquidation case to this Court. This is a contested matter pursuant to Federal Rules of Bankruptcy Procedure 9014 and 7001 through 7087.

**B.** *Joint Statement of the Nature of This Contested Matter.*

On March 25, 1991, the Debtor, a registered stockbroker, ceased operating following the discovery that its founder and president, Carl J. Wright, had suffered a self-inflicted gunshot wound. Mr. Wright died the next day. Law enforcement officials found several cassette tapes on which Mr. Wright had recorded a lengthy confession of having mismanaged and misappropriated $4 million to $5 million of his clients' monies in two in-house investment programs, known in the Trustee's Report as the "Investment Group," which includes C.J. Wright Investment Group, Ltd., a Florida limited partnership formed in 1990 (the "Limited Partnership"), and the "Deposit Account."

On April 24, 1991, following a preliminary investigation by the Securities and Exchange Commission, the Division of Securities of the Florida Comptroller's Office, and the Ocala Police Department, SIPC filed a Complaint and Application in the United States District Court for the Middle District of Florida, alleging that the Debtor was then insolvent and unable to meet its obligations as they matured and that there may be "customers" within the meaning of Section 5(a)(3) of SIPA in need of the protection provided by a liquidation under SIPA. By order entered on April 24, 1991, the District Court granted SIPC's application, thus commencing this liquidation case and removing it to this Court.

On May 15, 1991, this Court entered an Order Regarding Publication of Notices, Procedures for Resolution of Claims, and Other Relief, pursuant to SIPA Section 78fff–2, which established a claims filing procedure, a claims bar date, and a procedure for resolv-

ing any disagreement between the Trustee and any Claimant regarding the status of any claim as a "customer" claim under SIPA.[3] Two hundred and sixty-three (263) claims, including duplicates, were filed with the Trustee before the November 25, 1991 bar date. Sixty-seven (67) claims seeking priority as "customer" claims under SIPA were filed by 27 persons who had invested in the Debtor's Deposit Account program, including multiple claims filed by certain Claimants.

Pursuant to this Court's May 15, 1991 Order, the Trustee, on January 27, 1992, sent Determination Letters to the Claimants who had filed claims based on the Deposit Account. The Determination Letters advised these Claimants that, based on the Debtor's books and records, their claims would not be treated as "customer" claims under SIPA, but would be allowed as general unsecured claims against the liquidation estate. Only eleven Deposit Account Claimants (Austin, D. Camp, Hoit, Manning, Matthews (sic), McCurdy, McKay, Schroeder/Kirk, Seuntjens, Shields, and Stancliffe) filed timely objections to the Trustee's Determination Letters within the thirty-day period established by this Court's May 15, 1991 Order.[4]

At a status conference on June 11, 1992, this Court scheduled hearings on these 11 Deposit Account Claimants' objections to the Trustee's determinations that their claims, acknowledged to be allowable as general unsecured claims, were not entitled to priority as "customer" claims under Section 78lll(2) of SIPA.

**C.** *Joint Statement of Those Facts Which Are Admitted and Will Require No Proof at Trial.*

1. The parties stipulate and agree to the summary of the Debtor's operations as set forth in Exhibit A attached hereto.

---

3. At the status conference on June 11, 1992, U.S. Bankruptcy Judge Proctor indicted that he may be willing to reconsider the finality of the deadline for objection to the Trustee's determination.

4. Claimants Austin, Seuntjens, McCurdy, and Manning altered this paragraph as follows: Only

eleven Deposit Account Claimants (Austin, D. Camp, Hoit, Manning, Matthews [sic], McCurdy, McKay, Schroeder/Kirk, Seuntjens, Shields, and Stancliffe) filed objections to the Trustee's Determination Letters within thirty days.

2. The parties stipulate and agree to the following facts regarding SIPC:

SIPC is a non-profit membership corporation whose members include most interstate broker-dealers. Section 78eee(a).

SIPA requires SIPC to establish a fund via assessments of its members. Section 78ddd. SIPC is authorized to borrow from the U.S. Treasury up to $1.0 billion to supplement any shortfall in the SIPC Fund. These resources are available for the satisfaction of the claims of "customers" within certain statutory limits, as set forth in Section 78fff-3 of SIPA.

3. The parties stipulate and agree to the following facts regarding the Deposit Account:

From 1987 until early 1991, the Debtor offered to certain of its clients an alternative investment program known initially as the "Money Market Club" and later as the "Deposit Account."

Deposit Account investors delivered money to the Debtor and received a one-page document (a "Deposit Account Document") bearing the Debtor's letterhead (including the "SIPC" and "NASD" logos) that stated: (a) the amount invested; (b) a term of 12 to 60 months for the investment; (c) the fixed interest rate to be paid; (d) a penalty for early withdrawal; (e) whether interest was to be paid monthly; and (f) a statement that at the maturity date a new rate and term "can be negotiated." The Deposit Account Document was usually signed by both Carl Wright, as a representative of the Debtor, and the investor. A copy of the Deposit Account Document is attached as Exhibit "B"[5]. The investor in the Deposit Account investment program generally was issued a receipt to evidence the transaction.

Only three persons, the late Mr. Wright, Raymond Lozeau and Bruce Ballard, sold interests in the Deposit Account.

None of the Deposit Account investors received Confirmation Slips for the purchase of certificates of deposit or any other securities.

In just over three and a half years the Debtor obtained more than $1.2 million from at least 30 Deposit Account investors. All but three of these investors received monthly payments of "interest" through March of 1991 from various bank accounts controlled by Mr. Wright: until June of 1989, payments were made directly from the Debtor's Operating Account; from July of 1989, through May of 1990, payments were made from the Debtor's Customer Reserve Account; in June and July of 1990, these payments were made from CJW Limited's bank account; and from August of 1990, through March of 1991, payments were made from the CJW Limited Customer Reserve Account.

No trading account at FICS was ever established for the Deposit Account. No Deposit Account funds were ever reinvested in certificates of deposit or any other securities.

All of the checks which the Debtor collected from Deposit Account investors after April 1, 1990 ($350,000 from 12 persons including Austin–$20,000, Manning–$40,000, McCurdy–$120,000, Seuntjens–$35,000, Shields–$25,000, and Stancliffe–$10,000), were improperly endorsed by CJW Limited, and deposited directly into that company's bank account. These funds were used, with monies from other sources, to purchase for CJW Limited a parcel of commercial real estate in Ocala, and to build a 9,000 square foot, two-story office building on the property.

4. In addition, the parties stipulate and agree to the following facts regarding Claimant's claims:

Claimant was an investor in the Deposit Account.

5. Only one deposit account document is attached as an example because all the documents contain the same categories of information.

Claimant invested a total of $25,000.00 in the Deposit Account program, by payments to the Debtor on July 26, 1990.[6]

Prior to April 24, 1991, Claimant received payments from the Debtor (or its affiliates) as "interest" on the Deposit Account totalling $1,342.75.[7]

During the liquidation case, Claimant has received payments from the Trustee to-talling $4,079.40, which the parties agree shall reduce Claimant's claim by the same amount.[8]

At the time of each investment, the following documents were executed and delivered, copies of which are attached hereto as Exhibit B.[9]

Claimant's claim is allowable as a general unsecured claim.[10]

6. Each of the eleven claimants entered into a stipulation with plaintiff that varies in regard to the sums paid into the deposit account and the date the monies were paid. The payment dates and amounts for each of the other claimants are as follows:

| Claimant | Amount Invested | Investment Date |
|---|---|---|
| Stancliffe | $ 15,000.00 | 7/24/89, 5/9/90 |
| Schroeder | $150,000.00 | 5/13/88, 9/23/88, 10/4/88, 6/1/89, 6/23/89, 7/14/89 |
| Hoit | $ 75,000.00 | 3/21/89, 10/24/89 |
| Camp | $105,000.00 | 3/29/88, 5/15/89, 2/20/90 |
| Mathews | $ 10,000.00 | 12/27/88 |
| Austin | $ 30,000.00 | 1/27/90, 4/16/90, 1/22/91 |
| Seuntjens | $ 35,000.00 | 10/22/90 |
| McCurdy | $120,000.00 | 4/4/90 |
| McKay | $ 10,000.00 | 3/30/89 |
| Manning | $ 75,000.00 | 7/7/88, 10/26/89, 4/25/90 |

Mr. Camp's stipulation states that "This Stipulation is without prejudice to the Claimant's right to contend that the principal and interest payments related to $75,000 investment, which was fully repaid, are wholly unrelated and independent from his present claim and are irrelevant to the present analysis".
The date and amount used in the text is from the stipulation entered into by William and Edna Shields.

7. The amount of "interest" received by each of the other claimants is:

| | | | |
|---|---|---|---|
| Stancliffe | $ 1,569.30 | Austin | $ 1,808.37 |
| Schroeder | $ 31,326.60 | Seuntjens | $ 1,232.54 |
| Hoit | $ 13,057.74 | McCurdy | $ 11,000.00 |
| Camp | $100,696.51 | McKay | $ 1,943.28 |
| Mathews | $ 0 | | |

Manning "Not less than $10,324.77 and not more than $11,240.52."

8. The amount paid by the Trustee to each of the other claimants is:

| | | | |
|---|---|---|---|
| Stancliffe | $ 2,315.96 | Austin | $ 4,861.30 |
| Schroeder | $20,463.76 | Seuntjens | $ 5,822.78 |
| Hoit | $10,681.18 | Camp | $ 757.61 |
| McCurdy | $18,795.71 | McKay | $ 1,389.28 |
| Mathews | $ 1,724.34 | Manning | $ 9,814.00 |

9. Only the document executed by the Shields is attached as an example because each of the claimants received the same form of document.

10. Claimants Austin, Seuntjens, McCurdy and Manning altered this sentence as follows: Claimant's claim is allowable as a general unsecured claim. (This is without prejudice to claimant's claim to "customer" status.) Claimants Stan-cliffe, Schroeder, Hoit, Camp, and Mathews altered this sentence as follows: Trustee acknowledges claimant's claim is allowable as a general unsecured claim. (This is without prejudice to claimant's right to assert status as a priority customer claim.) Claimant McKay and Shields stipulated as stated in the text.

The Debtor prepared and sent to Claimant a copy of Internal Revenue Service Form 1099–DIV reporting the Debtor's payments of interest pursuant to the Deposit Account agreement.[11] A copy of Form 1099 is attached as Exhibit "C".[12]

D. *Joint Stipulation of Those Issues of Law On Which There is Agreement.*

1. Under Section 78fff–3 of SIPA, SIPC is authorized to advance to the Trustee, in order to satisfy "net equity" claims of "customers" not more than $500,000 per customer, and in no event more than $100,000 for that portion of a claim which is for cash.

2. The availability of SIPC's funds to satisfy the claims of Claimants who are "customers" within the statutory definition does not lessen the burden of customer's claims on the general estate or its general unsecured Claimants. To the extent of its advances, SIPC is subrogated to the claims of such Claimants. Section 78fff–3(a).

3. The Trustee in a SIPA liquidation case is required to discharge, in accordance with the provisions of Section 78fff–2, all obligations of the Debtor to a "customer" relating to, or net equity claims based upon on, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer insofar as such obligations are ascertainable from the books and records of the Debtor or are otherwise established to the satisfaction of the Trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date. Section 78fff–2(b).

4. "Customer" is a statutorily defined term of art. It means "any person (including any person with whom the Debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the Debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person, for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the Debtor arising out of sales or conversions of such securities, or any person who has deposited cash with the Debtor for the purpose of purchasing securities, but does not include ... (B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the Debtor ..." SIPA Section 78*lll* (2).

5. A Claimant of the Debtor who qualifies as a "customer" is entitled to the protection of a "net equity" claim under SIPA.

6. A person may be a "customer" with respect to some transactions with a defunct stockbroker, but not with respect to others. For any transaction or claim which does not fall within the statutory definition, there is no entitlement to preferred status under the statute, or advances from SIPC.

7. The burden of proof for establishing the preferred status under SIPA of a "customer" is on the Claimant seeking that status.

8. SIPC is prohibited from making any advance to the Trustee to pay or otherwise satisfy, directly or indirectly, any net equity claim of a customer who is a general partner, officer, or director of the Debtor, a beneficial owner of five percentum or more of any class of equity security of the Debtor (other than a non-convertible stock having fixed preferential dividend and liquidation right) ... or a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the Debtor. SIPA Section 78fff–3(a)(4).

E. *Joint Statement of Those Issues of Fact That Remain To Be Litigated.*

1. Unless the parties have otherwise stipulated above, what is the amount of Claimant's actual cash investment, and the amount of pre-bankruptcy payments made by the Debtor (or any affiliate) to Claimant with respect to participation in the Deposit Account?

---

**11.** All claimants with the exception of the Shields and the McKays deleted the word "agreement" from this paragraph.

**12.** There is no Exhibit C attached to this findings of fact and conclusions of law.

2. Unless the parties have otherwise stipulated above, was Claimant an officer or director of the Debtor, the beneficial owner of five percent or more of any class of equity security of the Debtor, or had the power, directly or indirectly, to exercise a controlling influence over the management policies of the Debtor?

3. Was the investment of monies with regard to the Deposit Account a loan to the Debtor, or a consummated purchase of an interest in a profit-sharing entity, or a deposit of funds with the Debtor for the purchase of securities?

F. *Joint Statement of Those Issues of Law That Remain for Determination By The Court.*

1. Was Claimant acting as a lender or "customer" of the Debtor, as defined by SIPA, when investing monies with regard to the Deposit Account?

2. If Claimant is determined to be entitled to "customer" status under SIPA, whether any "net equity" claim should be reduced by the amount of all payments received by the Claimant prior to the commencement of this case?

3. Whether the Claimant seeking preferred status or the Trustee bears the burden of proof on "customer" status?

*Additional Findings of Fact by the Court:*

Debtor solicited clients through advertisement in church bulletins and telephone books. Debtor marketed the deposit account as a safe investment that was insured by SIPC. The interest payments on the CDs offered through the deposit account ranged from one to three percentage points higher than those being offered by banks during the same time period.

None of the claimants had a substantial amount of previous investment experience. Each of the claimants testified that if they failed to receive required interest they would consider that the debtor had the obligation to pay the claimants the interest.

## CONCLUSIONS OF LAW

### JURISDICTION

The Court has jurisdiction over this proceeding pursuant to 15 U.S.C. § 78eee(b)(4) and through the Order of the United States District Court entered on April 24, 1991, removing this case to this Court.

## SECURITIES INVESTOR PROTECTION ACT

Congress enacted SIPA in 1970, to protect public customers of failed stockbrokers from losses encountered because of the insolvency of the broker. *SIPC v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975). SIPA does not protect all individuals effected by the collapse of a brokerage but provides protection to "customers" which is a statutorily defined term of art. *SIPC v. Executive Secur. Corp.,* 556 F.2d 98 (2nd Cir.1977); *SEC v. Albert & Maguire Secur. Co.,* 560 F.2d 569 (3rd Cir.1977); *SEC v. Packer, Wilbur & Co.,* 498 F.2d 978 (2nd Cir.1974). Customer is defined as:

> The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities and any person who has deposited cash with the debtor for the purpose of purchasing securities ... but does not include—(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor

15 U.S.C. § 78*lll* (2). A person who qualifies as a customer is entitled to receive their net equity. 15 U.S.C. § 78fff–2(b). "Net equity" is defined as:

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by—

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer) minus

(B) any indebtedness of such customer to the debtor on the filing date; plus

(C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff–2(a) of this title).

In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.

15 U.S.C. § 78*lll* (11).

Customer property is defined as:

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted....

15 U.S.C. § 78*lll* (4).

Thus all property of the insolvent broker's customers that is not specifically identifiable is placed into a fund to pay customer claims. Specifically identifiable property is property entrusted to a stockbroker by a customer that has remained in its identical form or which has been allocated to or physically set aside for the customer as of the filing date. The Trustee is authorized to satisfy net equity claims with customer property and, to the extent this is insufficient, from advancements from SIPC up to the statutory limit. 15 U.S.C. § 78fff–2(c). SIPA authorizes SIPC to advance up to $500,000.00 per customer with no more than $100,000.00 for cash claims to fulfill each customer's net equity. 15 U.S.C. § 78fff–3(a). To the extent customer property and SIPC advancements are insufficient to satisfy customer claims, the customer is entitled to participate in the general estate as an unsecured creditor. 15 U.S.C. § 78fff–2(c).

The trustee denied customer status to claimants because he determined that claimants had loaned funds to debtor and lenders are not "customers" under SIPA. Claimants counter that the transactions were not loans and that they fit within the "customer" definition. Claimants have the burden of showing that they are entitled to customer status. *SEC v. Packer, Wilbur & Co.,* 498 F.2d 978 (2nd Cir.1974).

### THE DEPOSIT ACCOUNT TRANSACTION

■ Claimants do not dispute the Trustee's assertion that lenders are not customers under SIPA rather claimants assert that the deposit account transactions were not loans. The trustee relies upon *In re Grand Union Co.,* 219 F. 353 (2nd Cir.1914) *appeal dismissed, Hamilton Invest. Co. v. Ernst,* 238 U.S. 647, 35 S.Ct. 938, 59 L.Ed. 1504 (1915) where the Second Circuit defined a loan as:

A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transactions will be considered a loan without regard to its form.

*Id.* at 356, 357.

To determine whether the deposit account transactions were loans, the Court must analyze the facts surrounding the transaction. *Calcasieu–Marine Nat. Bank v. American Employers' Insurance,* 533 F.2d 290 (5th Cir. 1976), *cert. denied, Louisiana Bank & Trust Co. v. Employers Liability Assur. Corp.,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1989). The deposit account transactions are consistent with a loan transaction in many respects. Claimants were to receive the principal given to debtor after a specified term.

Claimants were also to receive interest on their principal. However, claimants were subject to a penalty for early withdrawal which is not consistent with making a loan. In addition, the Court finds that claimants did not intend to loan money to debtor through their participation in the deposit account.

While the deposit account transaction is not entirely consistent with loaning money, it is consistent with purchasing CDs. Had debtor purchased CDs for claimants they would have received the return of their principal at the end of a specified term, and the investment would have earned interest. The trustee makes much of claimants' testimony that if they had failed to receive interest as required they would first look to debtor for payment. The Court finds that this is equally consistent with making a loan or with debtor acting as claimants' agent in purchasing CDs. In either case it is logical to look to one's principal or agent in the first instance to receive payment. In addition, imposing a penalty for early withdrawal is consistent with purchasing certificates of deposit. It is not unusual for such transactions to be subject to an early withdrawal penalty.

The Court also finds that claimants believed that they were depositing funds for the purchase of securities and were not told and were not aware that their investment was to become part of debtor's capital. Claimants did not intend to loan money to debtor. Each of the claimants testified that they deposited funds with the debtor for the purchase of certificates of deposits either for the purchase of individual CDs or jumbo CDs purchased by pooling the participants' investments. Raymond Lozeau, one of debtor's sales representatives, testified that the deposit account was sold on the basis that the funds would be pooled to allow the purchase of CDs. The Court found all the claimants to be very credible and finds that each claimant entrusted funds to debtor for the purpose of purchasing CDs. The Court further finds that the objective indicia of the transaction is entirely consistent with purchasing CDs. Because claimants did not intend to loan money to debtor and were unaware that this may have been debtor's intention, this case is

distinguishable from the cases relied upon by the trustee to support his argument that claimants loaned money to debtor. *See, SEC v. F.O. Baroff Co.,* 497 F.2d 280 (2nd Cir. 1974); *SIPC v. Executive Secur. Corp.,* 556 F.2d 98 (2nd Cir.1977); *In re Brittenum & Associates, Inc.,* 82 B.R. 64 (Bankr.E.D.Ark. 1987). Consequently, the Court disagrees with the Trustee's determination that the deposit account transactions were loans.

### DEPOSIT ACCOUNT DOCUMENT

██ Even though the Court has determined that the deposit account transaction is not a loan this does not end the inquiry. The Court finds that the deposit account document is a security. Section 78*lll* (14) of SIPA defines security as:

> The term "Security" means· any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, any investment contract ... (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C. 77a et seq. ])....

The Supreme Court of the United States defined security in *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The Court said "[a]s used in both the 1933 and 1934 [securities] Act security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits' " and that in defining securities "form should be disregarded for substance." *Id.* at 338, 88 S.Ct. at 554. This definition must be applied to the deposit account transaction. Each claimant testified that they expected debtor would profit from the deposit account transaction by investing the funds at a higher interest rate than that which each claimant was to receive, thus making a commission or profit on the transaction. Thus the transaction is consistent with issuing a security.

The Fifth Circuit defined security and specifically evidence of indebtedness as used in 18 U.S.C. § 2311 which prohibits carrying "any falsely made, forged, altered, or counterfeited securities" in *United States v. Jones*, 450 F.2d 523, 523 (5th Cir.1971). In *Jones* the Court held that evidence of indebtedness was not a catchall phrase but referred to "some written document which on its face establishes an obligation to pay a sum of money to the holder without regard to the custom and usage surrounding its actual employment." *Id.* at 525. The *Jones* Court held that an airline ticket was not a security even though it was redeemable for cash, because its primary purpose was for the delivery of a service.

Unlike the airline ticket, the deposit account document is a security, an evidence of indebtedness. The document contains the claimant's name, address, term for the deposit, interest rate, the percentage penalty for early withdrawal and claimant's and debtor's signatures. Each document also states "Special Instruction: Clients will receive monthly interest checks paid out the first business day of the month. At the end of the stated term all Principal will be returned and new interest rates and terms can be negotiated." On its face, this establishes an obligation to pay a sum of money to the holder as defined in *Jones*.

The Court finds that the issuance of the deposit account evidence of indebtedness is most analogous to an unauthorized purchase of a security. Each claimant gave funds to the debtor or debtor's representative with the understanding that debtor would purchase CDs for claimant's account; debtor failed to purchase any CDs; instead debtor issued the evidence of indebtedness to claimants. Issuing the deposit account evidence of indebtedness was an unauthorized transaction, because debtor was only authorized to purchase CDs for claimants' benefit.

### CUSTOMER STATUS

■ SIPA provides customer status for claims based on misappropriation and unauthorized purchases. *SEC v. S.J. Salmon & Co.*, 375 F.Supp. 867 (S.D.N.Y.1974); *SEC v. Howard Lawrence & Co.*, 1 Bankr.Ct.Dec.

577 (Bankr.S.D.N.Y.1975); *In re First State Secur. Corp.*, 34 B.R. 492 (Bankr.S.D.Fla. 1983); *In the Matter of Investors Secur. Corp.*, 6 B.R. 420 (Bankr.W.D.Pa.1980). In *SEC v. Howard Lawrence & Co., Inc.*, 1 Bankr.Ct.Dec. 577 (Bankr.S.D.N.Y.1975), the Court held that one claimant was a customer because he had given debtor $800.00 to buy certain stock and debtor purchased different stock. Claimant asked for his money back but was led to believe that in order to receive his money he would have to pay an additional $250.00. Claimant paid the additional sum. The Court found that claimant had not authorized the purchase of the stock and had paid the addition sum solely to receive the return of his investment. The Court held that claimant had a claim for cash based on misappropriation, that is, an unauthorized purchase of stock. Similarly, in *In re Gibralco, Inc.*, 53 B.R. 324 (Bankr.C.D.Cal.1985), the Court held that it would not deny customer status for claimant's lack of diligence where debtor converted the bonds entrusted to it by claimants. In *Gibralco* claimant failed to receive a confirmation slip for the bonds entrusted to debtor and did not follow up on information contained in his account statement but was entitled to customer status based on debtor's misuse of the securities entrusted to it.

■ The Court agrees with the *Gibralco* Court that customer status should not be denied for lack of diligence. Perhaps claimants' failure to question the payment of interest from different operating accounts was due to lack of diligence, however, the Court will not deny customer status for claimants' failure to question these payments. This is especially true because the interest payments made from these accounts could easily have been consistent with debtor's purchase of CDs as with making interest payments on a loan, because debtor was not required to hold the CDs in claimants' names. Nor is the failure to receive a confirmation slip from debtor sufficient to deny customer status.

Although lack of diligence will not cause the customer claims to fail, if claimants ratified the issuance of the evidence of indebtedness, then their claim to customer status will fail. *In re First State Secur. Corp.*, 34 B.R.

492 (Bankr.S.D.Fla.1983). Thus the Court must examine claimants' actions in regard to the issuance of the evidence of indebtedness to determine whether claimants ratified the purchase. *Id.* at 496. Under Florida law, a principal can ratify its agent's unauthorized acts only upon full knowledge. *Oxford Lake Line v. First Nat. Bank,* 40 Fla. 349, 24 So. 480 (1898). If an act is ratified based upon the suppression of a material fact or an unknown fact then the ratification is invalid being based on fraud. *Id.* Claimants did not have full knowledge because they did not know that debtor had failed to purchase CDs on their behalf. *In re First State Secur. Corp.,* 34 B.R. 492 (Bankr.S.D.Fla.1983). Consequently, claimants could not ratify the unauthorized issuance of the evidence of indebtedness and the issuance was unauthorized.

The Trustee argues that SIPA does not protect customer claims based on fraud or breach of contract. The trustee relies upon *In re Government Secur. Corp.,* 90 B.R. 539 (Bankr.S.D.Fla.1988); *SEC v. Howard Lawrence, Inc.;* and *In re MV Secur. Inc.,* 48 B.R. 156 (Bankr.S.D.N.Y.1985) to support this proposition. The Court agrees with the trustee, that in these cases the courts denied customer protection. But the Court finds these cases are distinguishable from this case because claimants in the cited cases authorized their broker to take some action which the broker failed to take or took action that was not in claimant's best interest, whereas here, debtor used claimants' funds for an unauthorized transaction. Thus the difference in the cases cited by the trustee and this case is the mere failure to act versus acting in an unauthorized manner in issuing an unauthorized security.

■ Courts that have addressed whether SIPA claimants qualify as customers have reserved customer protection for investors as opposed to lenders or persons acting in their individual capacity. *SEC v. F.O. Baroff,* 497 F.2d 280 (2nd Cir.1974); (customer status reserved for public customer of broker); *In re Brentwood Secur. Inc.,* 925 F.2d 325 (9th Cir.1991) (entrusting funds to broker in individual capacity precludes customer claim); *SEC v. First Security of Chicago,* 507 F.2d 417 (7th Cir.1974) (payment to debtor's principal in individual capacity precluded customer claim); *In re Stalvey & Associates, Inc.,* 750 F.2d 464 (5th Cir.1985) (broker-dealers access to bonds sufficient to create customer status however pledge as collateral precluded claim); *In re Waddell Jenmar Secur. Inc.,* 126 B.R. 935 (Bankr.E.D.N.C.1991) *affirmed* 991 F.2d 792 (4th Cir.1993) (making funds available to broker with the intent that broker purchase securities created customer claim); *In the Matter of Investors Secur. Corp.,* 6 B.R. 420 (Bankr.W.D.Pa.1980) (entrustment of funds determinative of customer status not broker's subsequent misuse of funds). The most important factor in determining customer status is whether claimant entrusted money or securities to the broker. *Id.*

Similarly, in the context of 11 U.S.C. § 741,[13] the Eleventh Circuit held that to establish customer status claimants must first show entrustment of funds to the broker for the purpose of effecting securities transactions and second, that the agreements concerning the transaction contain indicia of the usual fiduciary relationship between a broker and its public customer. *In re ESM Government Secur. Inc.,* 812 F.2d 1374 (11th Cir. 1987). The Court relied on SIPA cases in denying customer status in *ESM.* Thus the standard announced in *ESM* for establishing customer status is applicable in this SIPA case.

This Court has previously held that claimants entrusted funds to debtor for the purpose of purchasing CDs. Certificates of Deposit are securities. 15 U.S.C. § 78*lll* (14). Thus claimants have satisfied the first requirement for customer status: entrustment

---

13. The definition of customer contained in § 741 tracks SIPA's definition of customer. Section 741 states in pertinent part:

(2) "customer" includes—

(B) entity that has a claim against a person arising out of—

(i) a sale or conversion of a security received, acquired, or held as specified in subparagraph (A) of this paragraph; or

(ii) a deposit of cash, a security, or other property with such person for the purpose of purchasing or selling a security;

of funds for the purpose of effecting securities transactions.

The second element required by *ESM* is that the securities transaction contain "indicia of the usual fiduciary relationship between a broker and his public customer, not the characteristics of, at most, an ordinary debtor-creditor relationship." *Id.* at 1376 citing *SEC v. F.O. Baroff,* 497 F.2d 280, 284 (2nd Cir.1974). Had claimants loaned money to debtor as the trustee argues or knowingly purchased or ratified the purchase of the evidence of indebtedness, they would have only an ordinary debtor-creditor relationship with debtor. However, the circumstances in this case convince the Court that claimants entrusted money to debtor for the purpose of purchasing securities and that claimants were public customers attempting to invest through debtor thereby creating the usual fiduciary relationship between a stockbroker and its public customer. Accordingly, claimants are customers of debtor and have claims for cash.

## EVIDENCE OF INDEBTEDNESS

■ The Trustee argues that even if claimants are customers the evidence of indebtedness is all that claimants are entitled to receive pursuant to SIPA's remedial scheme. The Trustee cites *SIPC v. Associated Underwriters,* 423 F.Supp. 168 (D.Utah 1975) and *In re Atkeison,* 446 F.Supp. 844 (M.D.Tenn.1977) in support of his argument. In *Associated Underwriters,* the Court found that SIPA contemplates the return of the customer property held by the broker or the property the broker should be holding for the customer's account. The *Associated* Court found that the contract between debtor and claimants allowed for debtor's endorsement of the investment contracts purchased by claimants and that claimants' belief that their contract required the endorsement by a NYSE firm was mistaken. The fact that the investment contracts were worthless did not alter the fact that claimants received what they had bargained for when the trustee returned the investment contracts. Pursuant to SIPA, claimants received their specifically identifiable property and thus their claims were satisfied.

Similarly, in *In re Atkeison,* claimant purchased two investment certificates from a corporation found to be an alter ego of debtor. The corporation was formed for the purpose of loaning money to bond purchasers. The Court found that SIPA was intended to protect customers who "have either cash or securities or both in the custody of broker-dealer firms" and that if the certificates were not securities then claimant had deposited cash with debtor and if the certificates were securities then claimant had received the benefit of her bargain because she has the securities themselves. *Id.* at 847. The Court held that claimant had received all that she had bargained for, that is, the certificates which were specifically identifiable securities.

*Associated* and *Atkeison* are both distinguishable from this case because claimants did not authorize and did not ratify debtor's issuance of the evidence of indebtedness whereas in the cases relied upon by the trustee claimants received the specifically identifiable securities they had purchased. Thus the cases cited by the Trustee to support his argument are distinguishable because the purchase of the securities returned to claimants were authorized by claimant. Consequently, the Court does not agree with the Trustee's contention that claimants customer claims are satisfied by possession of the deposit account evidence of indebtedness, and the Court finds that claimants have a claim for cash against the fund of customer property which includes funds wrongfully converted by debtor.

## INTEREST

■ Claimants argue that they are entitled to receive the principal they invested and the interest they would have received had debtor purchased CDs on claimants' behalf and had the CDs matured. The Court does not agree.

Claimants as customers have claims for cash and are entitled to receive their net equity from the fund of customer property as defined in SIPA. Customer property is "cash ... at any time received, acquired, or held by or for the account of debtor ... including property unlawfully converted." 15 U.S.C. § 78*lll* (4). Claimants entrusted cash

to debtor which debtor used to improperly issue the deposit account evidence of indebtedness. Because debtor misappropriated these funds, claimants have a claim for that which they entrusted to debtor as customer property: the principal amount that was to be invested. Debtor did not convert the interest promised because it was never earned. Debtor only misused claimants initial investment. Likewise, net equity as defined in SIPA does not contain any reference to providing interest on claims to customers. Thus the most that claimants are entitled to receive is the return of the principal invested.

Claimants agree with the trustee that the amount each claimant is entitled to receive must be reduced by distributions to claimants. The amount of each customer claim will now be individually calculated.

### Austin—Claims 142, 143 and 144

Anne Austin entrusted $30,000.00 to debtor for the purchase of CDs. She initially gave debtor $10,000.00 on April 16, 1990, for a 12–month term and was to receive monthly interest at 9 percent per annum with a 4.625 percent penalty for early withdrawal. On January 27, 1990, she gave debtor an additional $10,000.00 on the same terms.

Mrs. Austin again entrusted $10,000.00 to debtor on January 22, 1991, for 12 months at 9 percent per annum with a 4.5 percent penalty for early withdrawal.

She received $1,808.37 in return of principal from debtor and $4,861.30 from the trustee during the SIPA proceeding. Thus Mrs. Austin has a customer claim for $23,330.33.

### Hoit—Claim 192

Marian Hoit entrusted $25,000.00 to debtor on October 24, 1989, for the purchase of CDs. She was to receive monthly interest at the rate of 9.25 percent per annum for 12 months with a 4.625 percent penalty for early withdrawal. She entrusted an additional $50,000.00 to debtor on March 21, 1989, for 36 months with monthly interest payments based upon earning 10.25 percent per annum with a 10 percent penalty for early withdrawal.

She received $10,681.18 from the trustee in liquidation and $13,057.74 in "interest" payments. Mrs. Hoit has a customer claim for $51,261.08.

### Camp—Claims 135, 136, 231 and 232

Donald Camp entrusted $15,000.00 for the purchase of CDs on May 15, 1989, for 12 months at 10.125 percent per annum with interest to be paid monthly. A 10 percent penalty for early withdrawal was imposed. He entrusted an additional $15,000.00 on February 20, 1990, for 12 months at 9 percent per annum with monthly interest payments and a 5 percent penalty for early withdrawal.

He has received $757.61 from the trustee during the liquidation and received $4,134.32 in return of principal. The trustee argues that the total amount Mr. Camp received in returned principal on a separate $75,000.00 "investment" deposit account, should be considered in arriving at the amount of his claim. The Court does not agree. Mr. Camp's previous dealing with debtor is separate from these claims and does not affect the determination of the amount of claims 135 and 136. Claims 231 and 232 were duplicate of claims 135 and 136 and no objection was entered in regard to these claims. Mr. Camp claimed customer status with respect claims 135 and 136 only. He testified that he had received $4,134.32 in "interest" on claims 135 and 136. Thus the $4,134.32 return of principal and the $757.61 paid by the trustee in liquidation in relation to those claims shall be subtracted from Mr. Camp's $30,000.00 investment. Mr. Camp has a $25,108.07 customer claim for cash.

### Manning—Claim 46, 47, 48, 62, 63 and 64

■ Dorothy Garren Manning deposited $75,000.00 with debtor for CDs. On July 7, 1988, she deposited $15,000.00 with debtor for 36 months to receive monthly interest checks based on interest of 10 percent per annum. A 10 percent penalty for early withdrawal was also imposed. On October 28, 1989, Mrs. Manning deposited $20,000.00 with debtor. Claimant was to receive monthly interest at 9.75 percent per annum with a 9 percent penalty for early withdrawal. Mrs.

Manning made her third deposit of $40,000.00 in two $20,000.00 transactions on April 25, 1990.

Mrs. Manning disputes the amount the trustee has paid her during the liquidation proceeding. No evidence was presented by either side to support the suggested figures by the trustee of $11,240.52 or by Mrs. Manning of $10,324.77. Because customer status is a preferred position and claimants have the burden of showing their entitlement to such status, and claimants failed to produce evidence to support their claim, the court finds Mrs. Manning has received $11,240.52 from the trustee in liquidation. Mrs. Manning has received $9,814.00 in return of principal on her total $75,000.00 investment. Mrs. Manning has a customer claim in the amount of $53,945.48.

### Mathews—Claim 157

Eleanor Mathews entrusted $10,000.00 to debtor for 36 months for investment in CDs to pay 9.5 interest per annum paid at the end of the 36–month term. A 10 percent penalty for early withdrawal was imposed on Mrs. Mathews's "investment."

She did not receive any interest payments but did receive $1,724.37 from the trustee in liquidation. Mrs. Mathews has a $8,275.63 customer claim for cash.

### McCurdy—Claim 171

George and Gloria McCurdy entrusted $120,000.00 to debtor for the purchase of CDs. The McCurdys were to receive monthly interest payments at 10 percent interest per annum and a 10 percent penalty for early withdrawal. The McCurdys gave debtor their money on April 4, 1990.

The McCurdys received $18,795.71 from the settlement between the trustee and Mrs. Wright and $11,000.00 return of principal as "interest" payments. The McCurdys have a customer claim for $90,204.29.

### Schroeder—Claims 128 and 129

Eva Schroeder entrusted $15,000.00 to debtor for 36 months on May 13, 1988, to receive 10 percent interest per annum paid monthly with a 10 percent penalty for early withdrawal. Mrs. Schroeder entrusted $40,000.00 on September 23, 1988 to debtor for 36 months again at 10 percent interest per annum to be paid monthly and again with a 10 percent penalty imposed for early withdrawal. On October 4, 1988, Mrs. Schroeder entrusted $20,000.00 to debtor for CDs to mature in 36 months on identical terms and again on June 23, 1989, Mrs. Schroeder entrusted $25,000.00 to debtor for the purchase of CDs. The June 23, 1989, funds were given to debtor and the evidence of indebtedness was issued to Mrs. Schroeder and Karren Kirk JTWROS. Mrs. Schroeder entrusted an additional $25,000.00 to debtor on the same terms of 10 percent interest with a 10 percent penalty. Finally, on July 14, 1989, Mrs. Schroeder entrusted $25,000.00 to debtor for investment in CDs at 10 percent interest for 36 months with interest to be paid monthly and with a 10 percent penalty for early withdrawal imposed.

Mrs. Schroeder received $31,326.60 in return of principal from debtor prior to liquidation and received $20,463.76 from the trustee since liquidation. Thus Mrs. Schroeder and Ms. Kirk have a customer claim for $98,209.64.

### Seuntjens—Claims 95, 96, 97, 100, 102 and 103

James and Carol Seuntjens invested $35,000.00 for the purchase of CDs for 60 months at ten percent annual interest with a 5 percent penalty for early withdrawal on October 22, 1990. They received three evidences of indebtedness from debtor, one for $15,000.00 and two for $10,000.00 each.

The Seuntjens received $5,822.78 from the trustee during the liquidation and received $1,232.54 in returned principal prior to the SIPA proceeding. The Seuntjens have a customer claim for cash for $27,944.68.

### Shields—Claims 45 and 61

William and Edna Shields entrusted $25,000.00 to debtor on July 26, 1990, for the purchase of 12 month CDs paying 9 percent interest annually with monthly interest payable to the Shields. A 4.5 percent penalty

for early withdrawal was imposed on the investment.

The Shields received $1,342.75 in return of principal from debtor prior to liquidation and $4,079.40 from the trustee during the liquidation proceeding. Mr. and Mrs. Shields have a customer claim for cash in the amount of $19,577.85.

### Stancliffe—Claims 138 and 139

Shirley Stancliffe entrusted $20,000.00 to debtor for investment in CDs. She gave debtor $5,000.00 on July 24, 1989, for 36–month CDs at 10 percent interest per annum with a 10 percent penalty for early withdrawal. She also entrusted $15,000.00 on May 9, 1990, for 60–month CDs at 9.5 percent interest per annum with a 10 percent penalty for early withdrawal.

She received $2,315.96 from the trustee during the SIPA proceeding and received $1,569.30 in return of principal prior to liquidation. Mrs. Stancliffe is entitled to a customer claim for cash in the amount of $11,114.74.

### McKay

Roland and Loretta McKay entrusted $10,000.00 to debtor on March 30, 1989, to purchase 12–month CDs at 10.125 percent interest per annum with a 10 percent penalty for early withdrawal.

The McKays received $1,389.28 from the trustee during the SIPA proceeding and received $1,943.28 in return of principal prior to the SIPA proceeding. They have a customer claim for cash in the amount of $6,667.44.

### Conclusion

The Court will enter separate orders in regard to each claimant consistent with these findings of fact and conclusions of law.

### EXHIBIT "A"

#### (Deposit Account)

*The Debtor's Operations.*

The Debtor was a Florida corporation with a business office in Ocala, Florida. It was registered with the Securities and Exchange Commission as a securities broker-dealer, pursuant to Section 15(b) of the Securities and Exchange Act of 1934. It was a member of the National Association of Securities Dealers ("NASD") and a participating member of the Securities Investor Protection Corporation ("SIPC"), a non-profit membership corporation established under SIPA.

The Debtor was known in the industry as an "introducing broker" because it did not have a seat on a national or regional stock exchange. It conducted securities trades through a clearinghouse, Financial Institution Clearing Services (known as "FICS"), a division of J.W. Charles Securities. The Debtor also made purchases for its clients directly from certain mutual funds. Because of the relatively small amount of net capital it maintained, the Debtor was prohibited by applicable regulations from holding securities for its customers.

The Debtor was incorporated on November 21, 1984, but did not begin operating until September of 1985. The Debtor's voting stock (7,500 shares) was owned by its founder and president, Carl J. Wright (3,375 shares, or 45%), his wife Christine B. Wright (1,875 shares, or 25%), who also acted as the office manager, and Raymond S. Lozeau (2,250 shares or 30%). The Debtor had only two directors, Mr. Wright and Mr. Lozeau.

The Debtor's records indicate that 109,000 shares of Class B non-voting stock were issued to and held by: Carl J. Wright (25,000 shares); Christine Wright (10,000 shares); John and Michael Paglia (25,000 shares); E. Grant Coulter (10,000 shares); Raymond Lozeau (10,000 shares); Bruce Ballard (10,000 shares); James Moran (10,000 shares); James Smith (5,000 shares); Walter Baker (1,000 shares); Arnold Davis (1,000 shares); Alex Gillespie (1,000 shares); and Blaine Hoffman (1,000 shares).

During its first year of operations, the Debtor obtained capital of (a) $92,618, from Mr. Wright, from monies he had borrowed from friends and relatives ($45,000 from Wallace A. Moran in 1984, $25,000 from Bruce Ballard in 1985, and approximately $22,000 from his mother-in-law) and (b) $27,000, bor-

rowed from Victor and Henrietta Cabral on or about October 31, 1985.

On October 26, 1989, Mr. Wright formed another Florida corporation, CJW Limited, Inc. ("CJW Limited"). The shares of voting stock were held by Carl J. Wright (3,300 shares, or 44%), Raymond S. Lozeau (2,175 shares, or 29%), Christine B. Wright (1,800 shares, or 24%) and Walter Baker, Mr. Wright's brother-in-law (225 shares, or 3%). Mr. Wright was the president, vice president and treasurer of this corporation, and Mr. Lozeau was the secretary. CJW Limited filed a petition for relief under Chapter 11 of the Bankruptcy Code on May 21, 1991, which case was converted to Chapter 7 on April 16, 1992 (Case No. 91–2641–3P7). Charles W. Grant of Jacksonville was appointed as the Chapter 7 trustee for CJW Limited.

In the Debtor's ordinary purchase of publicly listed securities for its customers through FICS, the "paper trail" would generally consist of:

1. the customer's order, written on a ticket and executed by a telephone call to FICS from a sales representative or Mrs. Wright;

2. the customer would deliver a check payable to the Debtor or to FICS (In some cases the Debtor would debit the customer's cash balance of FICS);

3. the customer's check (or a check written on the Debtor's account) would be deposited in an account at Barnett Bank of Marion County, from which only FICS could make withdrawals; each deposit would be evidenced by a Deposit Slip (and a carbon copy thereof in the Debtor's FICS Account Deposit Book) and an entry on an office ledger known as the "Checks Deposited Blotter;"

4. the trade would be confirmed the same day by a FAX transmission from FICS to the Debtor; shortly thereafter, a printed Confirmation Slip would be mailed by FICS to the customer with a copy to the Debtor and to the customer's sales representative;

5. the trade would be recorded in a ledger kept by the Debtor known as the "Buy–Sell Blotter," which listed the customer, the security being traded, the price, the sales representative and the commission that the Debtor and the sales representative would earn;

6. each sales representative recorded all trades and commissions earned in a personal ledger which was submitted each month to Mr. Wright or Mrs. Wright for verification and payment of the commissions earned.

For each stock trade, for example, FICS would have to be paid $16.30 per ticket plus 3¢ for each 100 shares. FICS would retain its commission and forward checks to the Debtor for its commission.

Bank certificates of deposit, earning approximately one point more interest than local banks' certificates, could also be purchased through FICS, but the gross commission for the Debtor was only $2.75 per $1,000. The payments that the Debtor received from FICS would then be shared with the sales representatives who initiated the purchases.

Ballard and Lozeau received, usually within thirty days after turning in their personal ledgers, a commission equal to 5% of the amount of each client's Deposit Account investment, regardless of the interest rate or term. Another 5% "trail" commission was earned if, at the end of the initial term, the investor agreed to leave the funds in the Deposit Account for another term;

The commission on a Deposit Account investment of $15,000 would have been $750.00; the commission that a sales representative would have earned on the purchase through FICS of a publicly traded $15,000 bank certificate of deposit would have been only about $11.00 (based on $2.75 per $1,000 paid by FICS, with the Debtor retaining half of the commission); and

Transactions with mutual funds generated an initial commission which was retained by the Debtor from the amount paid by the customer; the Debtor would then forward the balance of the customer's payment to the fund. The commission retained by the Debt-

or then had to be split with the sales representative. The mutual funds also paid the Debtor annual "trail" commissions on all prior sales as long as the client retained the mutual fund shares.

None of the sales of Investment Group/Limited Partnership interests or Deposit Account contracts were recorded on the Debtor's Buy–Sell Blotter; but such sales and the commissions earned were recorded on the sales representatives' personal ledgers which were submitted to management each month.

The Debtor operated on a fiscal year basis, from November 1, to October 31:

1. In its first fiscal year, ending October 31, 1986, the Debtor suffered a reported loss of approximately $79,993; and in its second fiscal year, the Debtor reported net income of only $2,727.

2. The Debtor reported net income of $165,079 for fiscal year 1988, but $41,-871 of the reported income was the result of an "extraordinary item," the estimated tax benefit from realizing a net operating loss carry forward arising in a prior year. Most of the $123,-208 of reported income before the extraordinary item, however, was the result of reporting monies obtained from Investment Group and Deposit Account investors as revenues of the Debtor's business.

3. The reported results for fiscal years 1989 and 1990 were net losses of $7,856 and $47,526, respectively. The Debtor never derived sufficient commission income from FICS and the mutual funds to pay its operating expenses.

### *Debtor's Misapplication of Client Funds.*

A substantial amount of the $4.0 million invested by Investment Group/Limited Partnership and Deposit Account Claimants can be accounted for, as follows:

| | |
|---|---:|
| Payments to Deposit Account Claimants, as interest or principal | $ 269,778* |
| Payments to Investment Group, Limited Partner Claimants, as "withdrawals" | 221,509* |
| Investment Group/Limited Partnership trading losses | 995,125 |
| Interest paid on Investment Group margin accounts from May of 1988 through March of 1991 | 102,436 |
| Subsidy of Debtor's business; payments of expenses in excess of revenue | 903,647 |
| Deposit Account and Investment Group checks diverted to pay cash of the Wright Financial Center Building | 362,000 |
| Estimated commissions paid to sales representatives on sales of interests in Deposit Account and Investment Group/Limited Partnership interests (5% on $4.0 million) | 200,000 |
| Purchases of Civil War objects | 45,955 |
| Payments to and for the benefit of Carl Wright (estimate) | 200,000 |
| Loans to Triman, Inc. (Cost Plus Computers) | 110,000 |
| TOTAL | $3,410,450 |

* Does not include payments to participants who had withdrawn from program prior to March 25, 1992, and who are not Claimants in this case.

---

The balance of Investment Group/Limited Partnership and Deposit Account investors' monies paid: (a) cost overruns and debt service on the mortgage notes on the Wright Financial Center Building; (b) legal and accounting fees incurred in the formation of the Limited Partnership in 1990; (c) debt service on the subordinated notes to Mr. and Mrs. Cabral; (d) Deposit Account participants who, having withdrawn from the program before March 25, 1991, are not Claimants in this case; (e) Investment Group members who, having withdrawn from that program prior to March 25, 1991, are not Claimants in this case, which payments would have included a return of their initial investments plus their shares of reported "profits"; and (f) Mr. Wright's friends and family members.

# EXHIBIT B

## C.J. Wright
### AND CO, INC.

SECURITIES DEALER

DEPOSIT ACCOUNT

Account Name William B. and Edna Shields JTWROS

Social Security Number 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

Address 13820 S.W. 39th Ave

Ocala Fl 32673

Phone Number 347-1333 _____ Home _____ Office

Account Rep. #102

| Term | Dollar Amount | Annual % | M/M # |
|---|---|---|---|
| 6 Months | | | |
| 12 Months | 25,000.00 | 9% | |
| 24 Months | | | |
| 36 Months | | | |

Penalty For Early Withdrawal 4.5% ____ %

Monthly Interest Check Yes ___ X ___ No _____

Address to send Check (if other than above)

Bank Name _____

Address _____

Account # _____

Other Address _____

Special Instructions : Clients will receive monthly interest checks
paid out the first business day of the month. At the end of the stated
term all Principal will be returned and new interest rates and terms
can be negotiated.

Date _____ 7/26/90. _____ Date 7-26-90

Signature _William E Shields_ Principal _C.J.G_

2403 S.E. 17th Street • Suite 401 • Ocala, Florida 32671 • 901-351-1811 • 1-800-432-8836

