**In re FIRST INTERREGIONAL EQUITY CORPORATION, Debtor.**

**Adversary No. 97–02165(SIPA)(RG).**

United States Bankruptcy Court, D. New Jersey.

Feb. 19, 2003.

267

McCarter & English, by Hayden Smith, Jr., Esq., Newark, NJ, for Richard W. Hill, Esq., SIPA Trustee for First Interregional Equity Corporation.

Bonnie P. Josephs, Esq., New York City, Claimant Appearing Pro Se.

Stephen P. Harbeck, Esq., General Counsel, Securities Investor Protection Corporation, by Josephine Wang, Esq., Senior Associate General Counsel, Washington, DC, for Securities Investor Protection Corporation (SIPC).

## OPINION

ROSEMARY GAMBARDELLA, Chief Judge.

Presently before the Court is a Motion of Richard W. Hill, Esq., SIPA Trustee, for First Interregional Equity Corporation to Affirm the Trustee's Claim Determination on a claim filed by Bonnie P. Josephs. Ms. Josephs has filed Objections to the Trustee's Determination of Claim. The Securities Investor Protection Corporation (SIPC) has filed a Memorandum in Support of the SIPA Trustee's Motion. This Court conducted a hearing on the matter on April 20, 2001. The following constitutes this Court's findings of fact and conclusions of law.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter stems from a liquidation proceeding pursuant to the Securities Investor Protection Act of 1970 ("SIPA"). On March 6, 1997, the Securities and Exchange Commission (SEC) filed a Complaint in the United States District Court for the District of New Jersey against FIEC, First Interregional Advisors Inc. and Richard Goettlich, alleging *inter alia,* that the defendants participated in a massive fraudulent "Ponzi" scheme. This liquidation proceeding commenced on March 10, 1997 when, following the filing by the Securities Investor Protection Corporation (SIPC) of an Order to Show Cause, the Honorable Maryanne Trump Barry, U.S.D.J. for the District of New Jersey, entered an Order adjudicating that the customers of First Interregional Equity Corporation ("FIEC") were in need of the protection afforded by the Securities Investors Protection Act (SIPA). On the same day, Richard W. Hill, Esq. was appointed Trustee ("Trustee") for the liquidation of FIEC and the matter was removed to this Court commencing Adversary Proceeding 97–02165, *SIPC v. First Interregional Equity Corp., et al. See* 15 U.S.C. § 78eee(b)(4).

Under SIPA, the Debtor's customers, upon notice, must file timely written statements of claims with the Trustee, but in most cases, need not file a formal proof of claim. *See* 15 U.S.C. § 78fff–2(b). Subsequently, the Trustee discharges the debtor's obligations to customers who have cash, securities or net equity claims. These obligations must be evidenced on the debtor's books and records of the Debtor or in some method satisfactory to the Trustee. *See* 15 U.S.C. § 78fff–4(e).

Pursuant to this Court's Order issued on May 19, 1997, the Trustee published notice of the FIEC's liquidation and mailed notice and claims forms to all customers and creditors listed in FIEC's books and records. Bonnie Josephs ("Claimant" or "Josephs") timely filed a "Customer Claim" on June 26, 1997 for the following securities other than leases claimed to be securities:

| Security No. | Name | Amount | Percent Due | Due Date |
|---|---|---|---|---|
| # 1 | Port Authority of NY/NJ | $100,000.00 | 6.75% | 10/01/2019 |
| # 2 | NYS Dorm Authority | $115,000.00 | 5.50% | 07/01/2014 |
| # 3 | Port Authority NY/NJ | $100,000.00 | | |
| # 4 | NYC B/E | $175,000.00 | 6.00% | 10/15/2026 |
| # 5 | NYC | $125,000.00 | 7.40% | 02/01/2006 |
| # 6 | NYC | $100,000.00 [1] | 6.25% | 04/15/2007 [2] |

1. At the April 20, 2001 hearing, Josephs agreed that this claim was properly $80,000. (Tr. at 68).

2. These bonds appear to have totaled $80,000. FIEC had only $80,000 of these bonds. The

*See* Certification of Eduardo J. Glas, Esq., Exh. A ("Glas Certification, Exh. ——").

Additionally, Ms. Josephs claimed a credit balance of $185,000.00 for certain Urban Development Corporation (UDC) bonds that FIEC allegedly called and redeemed. The $185,000 credit balance consists of $175,000 for cash that was to be used to purchase the NYC B/E Bonds and $10,000 for a called Puerto Rico Bond, I.M.E.P.C. 10.500% due 6/01/10.

By a "Notice of Trustee's Determination of Claim" dated December 3, 1999, the Trustee only allowed Ms. Josephs' claim for Security # 1, and disallowed her other claims. Regarding Security # 2, FIEC's records indicate that Ms. Josephs only made a partial payment of $64,874.09 for the bonds. Ms. Josephs admits to an outstanding balance of $49,570.91 on Security # 2. Ms. Josephs asserts that she is willing to pay the balance due or set off the amount against her other claims in this matter for delivery of the bonds. The Trustee disallowed the claim for Security # 3 because it duplicated the Security # 1 claim. Ms. Josephs does not dispute the Trustee's determination regarding Securities # 1 and # 3.

At issue are Ms. Josephs claims regarding Securities # 2, # 4, # 5, # 6, and the credit balance. The Trustee disallowed Securities # 4, # 5, and # 6 because FIEC's books and records do not indicate that, as of March 6, 1997, the claimed securities were registered in any FIEC account maintained in Ms. Josephs' name. The second basis on which the Trustee disallowed the claims for Securities # 4, # 5, and # 6 was his determination that Ms. Josephs loaned the Securities to FIEC. Loans of securities do not qualify as "Customer Claims" as that term is defined by SIPA. The Trustee disallowed the claim for the credit balance of $185,000.00 on the basis that it was not reflected in FIEC's books and records, and the securities were loaned by Ms. Josephs to FIEC and so do not qualify as "customer claims", and at least $175,000 of the cash claim was a duplicate of the claim for Security # 4.[3] Additionally, the Trustee determined that FIEC loaned in the amount of $150,000.00 plus interest at the prime rate to Josephs on December 13, 1993. Ms. Josephs admits that FIEC loaned her $150,000 and that the sum remains to be paid, but that this sum may be set off against her recovery in this matter. The Trustee has reserved all rights of set-off and collection to recover this debt plus interest from Ms. Josephs.

In the case at bar, the Trustee asks this Court to affirm his determination that Ms. Josephs was not a "customer" of FIEC as that term is defined under SIPA, because she lent securities to FIEC in return for interest payments higher than the coupon interest rate and his subsequent determination of her claims. The Securities Investor Protection Corporation ("SIPC") supports the Trustee's argument. Ms. Josephs argued that she maintained a customer/broker relationship with FIEC for many years, and specifically that she gave FIEC physical custody of the securities at issue for "safekeeping" rather than "lending" purposes.

---

balance was in Josephs' safe deposit box. (Josephs Dep. Tr. 9–12).

**3.** The Trustee also acknowledged receipt of an additional claim in the amount of $616,115.53 which Josephs asserted against FIEC with respect to investments in leases, lease assignments and/or lease payment assignments. The "Lease Claim" was not addressed in this Determination Notice but is the subject of separate proceedings.

Ms. Josephs argues that FIEC redeemed $175,000.00 worth of Urban Development Corporation bonds and deposited the cash in her reserve account in February 1997 (Account 500–71–162), Exh. 7. She alleges that she directed FIEC to purchase the bonds listed above as Security # 4 with this money. Ms. Josephs states that because FIEC's records do not reflect the purchase or registration of $175,000.00 worth of NYC B/E bonds on her behalf, her claim for Security # 4 is really a cash claim for monies deposited in her reserve account. Ms. Josephs testified that at that time, she anticipated that FIEC would continue to pay her an additional four percent (4%) interest with respect to the new bonds as with previously purchased bonds. (Tr. at 89). Ms. Josephs further argues her reserve account balance should reflect $10,000.00 for a Puerto Rico Bond (I.M.E.P.C. 10.500% due 6/01/10) which FIEC called and redeemed in 1993.

This Court conducted a hearing on April 20, 2001. At that time Ms. Josephs asserted an additional claim for $35,000.00 of Municipal Assistance Corporation Bonds ("MAC Bonds"), arguing their initial omission from her written statement of claims resulted from FIEC's failure to list the MAC Bonds in any report provided to the Claimant, with the exception of a single listing in a 1989 report. Ms. Josephs asserts she first became aware of the MAC Bonds in the pre-trial discovery leading up the April 20, 2001 hearing. Ms. Josephs argues the $35,000.00 MAC Bonds are directly related to other items in her claim and do not present any new issues of fact or law. Ms. Josephs further argues the additional sum of $35,000.00 places no undue burden on the parties. The Trustee objects to the assertion of the claim as untimely. The Trustee further asserts that the claim, if allowed, does not qualify as a customer claim based on the same asserted lending relationship between the parties. SIPC objects, arguing Ms. Josephs' late assertion raises the issue of whether, in the context of a SIPA proceeding where the original claim is timely filed, a claim may be amended after the claims bar date. SIPC further argues Claimant's request is a new claim that is time barred by statute. Alternatively, SIPC argues that even if this claim is deemed an amendment, there is no basis to allow it on equitable grounds.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference by the United States District Court of New Jersey dated July 23, 1984. The issues raised by this contested matter are core proceedings as defined by Congress in 28 U.S.C. § 157(b)(2)(A), (B), (K) and (O).

### 1. Bonnie Josephs' Relationship with FIEC.

Ms. Josephs is an experienced attorney of over thirty years, with her own general practice concentrating primarily in the area of family law and related fields. (Transcript of April 20, 2001 at 38) ("Tr. at ——"). In the early 1970's, Ms. Josephs' mother Helen Josephs, a successful businesswoman, began investing in tax-free, municipal bearer bonds under the advice of her broker, Herbert N. Goettlich. (Tr. at 40–41). When Herbert Goettlich formed FIEC, Helen Josephs continued investing with Herbert Goettlich as her broker. *Id.* Sometime in the 1970's, Helen Josephs delivered certain municipal bearer bonds to FIEC to be held and returned on demand. (Tr. at 41). In exchange, FIEC paid Helen Josephs 4% interest per annum over and above the coupon interest amount on the bonds. Bonnie Josephs testified that she understood that Herbert Goettlich

held the bonds in "safekeeping" for her mother and that she, Bonnie Josephs, subsequently would follow the "same pattern." *See* Tr. at 43. Helen Josephs died in February 1984. (Tr. at 45). Helen Josephs' relationship was the precursor to Bonnie Josephs' relationship with FIEC and the Goettlich family.

From approximately January 1, 1979 until February of 1997, Ms. Josephs maintained a brokerage account with First Interregional Equity Corp. FIEC was a registered broker-dealer engaged primarily in the sale of fixed-income investment products, including municipal bonds. FIEC later became involved in the sale of personal property in which the lessees were municipal governmental entities.

Ms. Josephs maintained three accounts with FIEC: two joint accounts (one with her daughter, Melodie Winawer [FIEC Account 2102216] and another with her son, Paul Josephs [FIEC Account 21034418]), and one individual account. She began investing with FIEC in 1979 with bonds given to her by her mother. Ms. Josephs eventually inherited her mother's bonds and continued to invest with FIEC and the Goettlichs until the instant liquidation proceeding commenced in 1997.

The Trustee asserts the claims filed by Ms. Josephs are not "Customer Claims" entitled to SIPA coverage because Ms. Josephs loaned the securities to FIEC. Ms. Josephs' claims "customer" status based on her long-term relationship with FIEC and the Goettlichs.

To resolve the instant matter this Court must determine whether Ms. Josephs is entitled to "customer" status under SIPA.

### 2. Securities Investor Protection Act.

Congress passed the Securities Investor Protection Act of 1970, as amended by 15 U.S.C. § 78aaa *et seq.* ("SIPA"), in response to the collapse of several brokerage houses in the 1960's. *See e.g., Barton v. SIPC,* 182 B.R. 981, 984 (Bankr.D.N.J. 1995); *see also In re Brentwood Securities, Inc. (SIPC v. Pepperdine University),* 925 F.2d 325, 326 (9th Cir.1991). To bolster customer confidence in the securities markets, SIPA grants customers of insolvent brokers priority preference status over general creditors. *See* 15 U.S.C. § 78fff(c)(2)(B); *see also SIPC v. Barbour,* 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975)(discussing the background and purposes of SIPA). "Not unlike the FDIC, SIPC insures investors who deposit cash or securities with a broker against the risk of broker insolvency." *In re Brentwood Securities, Inc. (SIPC v. Pepperdine University),* 925 F.2d 325, 327 (9th Cir.1991). In the event the insolvent broker has a deficiency of assets, the Securities Investor Protection Corporation is authorized to advance funds to satisfy net equity claims of customers not exceeding $500,000 per customer. No more than $100,000 of that claim may represent reimbursement of cash. *See* 15 U.S.C. § 78fff-(3)(a); *see also SEC v. Aberdeen Securities Co., Inc.,* 480 F.2d 1121, 1123 (3rd Cir. 1973) *cert. denied* 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); *Barton v. SIPC,* 182 B.R. 981, 984 (Bankr.D.N.J. 1995).

▆▆▆▆ A claimant is not entitled to SIPC protection unless he/she is a "customer" as that term is defined by SIPA. *See In re Brentwood Securities, Inc. (SIPC v. Pepperdine University),* 925 F.2d 325, 327 (9th Cir.1991). These protections are not available to general creditors of the bankrupt debtor. "Customers" are entitled to a *pro rata* share of the fund of "customer property," which is comprised of all cash and securities received, acquired or held by or for the account of a

broker for its "customers." 15 U.S.C. § 78*lll*(4). "Customers" are also entitled to payment of not more than $500,000 toward the amount by which their "net equity" claims against the estate exceed their ratable share of the customer property fund, and in no event more than $100,000 for that portion of their claims which is for cash. *See* 15 U.S.C. §§ 78*lll*(11) & 78fff 3(a). Creditors who do not qualify as "customers" are limited to recovering their share in the *pro rata* distribution of the general estate of the debtor. *See In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 599 (D.N.J.1986).

■ In a SIPA proceeding, the burden of proof rests with the party seeking customer status. *In re Brentwood Securities Inc.*, 925 F.2d 325, 328 (9th Cir.1991); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 115 (Bankr.S.D.N.Y.1997).

The instant dispute centers on the characterization of Ms. Josephs relationship with FIEC and its principals. It is undisputed that Ms. Josephs' mother, Helen Josephs, entered into a relationship with FIEC and Herbert Goettlich in the early 1970's. Ms. Josephs claims she is a customer of FIEC, arguing that as her mother's successor, she continued and expanded upon her mother's long-term customer relationship with FIEC. Accordingly, Ms. Josephs filed claims asserting customer status.

### 3. The Trustee's Determination of the Josephs' Claim.

The Trustee denied Ms. Josephs' claims for Securities (4) through (6) and the credit balance based in part upon a determination that Ms. Josephs was not a customer of FIEC. The Notice of Trustee's Determination of Claim dated December 3, 1999, reads in relevant part:

The Trustee has determined to DISALLOW your claim for Securities (4) through (6). The Trustee has made this determination because FIEC books and records indicate that as of March 6, 1997, the claimed Securities were not in any of the FIEC accounts maintained in your name. Moreover, the Trustee has determined that you are not a Customer of FIEC within the meaning of 15 U.S.C. § 78*lll* (2) with respect to Securities (4) through (6) ... In your previous correspondence to Richard Goettlich, to First Interregional Equity Corp. and to the Trustee's counsel ... you have acknowledged that you loaned Securities (4) through (6) to FIEC. The Trustee has determined that your Claim for Securities (4) through (6) does not qualify as a claim of 'Customer' because, as you have acknowledged, Securities (4) through (6) were loaned by you to FIEC. Finally, please note that Security (6) is only reflected as 80,000 NYC 6.25% due 4/15/07 in the supporting documentation submitted with your Customer Claim....

The Trustee has also determined to DISALLOW your claim for a Credit Balance in the amount of $185,000 for three reasons. First, the Trustee has made this determination because FIEC books and records indicate that as of March 6, 1997, there was no such cash balance due and owing in any of the FIEC accounts maintained in your name. Second, the Trustee has made this determination because the securities referenced by you with respect to the claimed Credit Balance in the amount of $185,000 are securities which were identified in your prior correspondence as securities loaned to FIEC.... Accordingly, as detailed above, the Trustee has determined that with respect to such securities or the proceeds thereof you are not a Customer of FIEC within the

meaning of 15 U.S.C. § 78*lll* (2) because, as you have acknowledged, the underlying securities were loaned by you to FIEC. Finally ... as acknowledged in your Customer Claim, the claimed Credit Balance to the extent of $175,000 is an alternative claim to your claim for Security (4) above....

Trustee's Determination of Claim, p. 3–4.

## 4. Customer Status under SIPA.

To be characterized as a customer under SIPA, a claimant must satisfy the requirements of the statute. 15 U.S.C. § 78*lll*(2) states in pertinent part:

For purposes of this chapter, including the application of the Bankruptcy Act to a liquidation proceeding:

(2) Customer

The term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities, but does not include—

(A) any person to the extent that the claim of such person arises out of transactions with a foreign subsidiary of a member of SIPC; or

(B) any person to the extent that such person has a claim for cash or securities which by contract, agreement, or understanding, or by operation of law,

is part of the capital of the debtor, or is subordinated to the claims of any or all creditors of the debtor, notwithstanding that some ground exists for declaring such contract, agreement, or understanding void or voidable in a suit between the claimant and the debtor.

15 U.S.C.A. § 78*lll*(2)(2001).

 "It is clear that in defining the term customer, Congress intended to protect those who had entrusted cash or securities to their brokers/dealers for the purpose of trading and investing." *In re Hanover Square Securities,* 55 B.R. 235, 238 (Bankr.S.D.N.Y.1985); *see also In re Investors Security Corp.,* 6 B.R. 420, 424 (Bankr.W.D.Pa.1980); *SEC v. F.O. Baroff Co.,* 497 F.2d 280, 283 (2nd Cir.1974); *In re Stalvey & Assoc.,* 750 F.2d 464 (5th Cir.1985); *In re John Muir & Co.,* 51 B.R. 150 (Bankr.S.D.N.Y.1985). "SIPA was not designed to provide full protection to all victims of a brokerage collapse." *In re Bevill, Bresler & Schulman Asset Management Corp.,* 67 B.R. 557, 599 (D.N.J. 1986) (*citing SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 983 (2d Cir.1974)). "[I]ts purpose was to extend a measure of special protection for the investments of those parties who fall within the statutory definition of the 'customer.'" *Id.* The definition of customer consists of three basic elements:

(1) the claimant must have a claim for securities or cash "received, acquired, or held" by the broker-dealer in the ordinary course of its business;

(2) the securities or cash must have been received, acquired, or held "from or for the securities account" of the claimant; and

(3) the securities or cash must have been received, acquired, or held by the broker-dealer either (i) for safe-

keeping, (ii) with a view to sale, (iii) to cover consummated sales, (iv) pursuant to purchases, (v) as collateral, or (vi) for effecting transfer. *Id.*

In addition, drawing on the legislative history of SIPA and its predecessor, Section 60(e) of the Bankruptcy Act, 11 U.S.C. § 96(e) (1938), courts have consistently emphasized two factors which govern the customer status of particular claimants: (1) the transactions in which they were engaged and which form the basis of their claim of customer status must have been related to investment, trading or participation in the securities market, *id.* at 600 (*quoting SEC v. F.O. Baroff Co., Inc.*, 497 F.2d 280, 284 (2nd Cir.1974)); and (2) the transactions must have arisen out of the type of fiduciary relationship which generally characterizes the relationship between a broker-dealer and its customers. *Id.* (*quoting In re Stalvey & Associates, Inc.* 750 F.2d 464 (5th Cir.1985)). Thus, in addition to the requirements of the statutory definition, these two latter factors must also be satisfied. *See also, Securities Investor Protection Corp. v. Executive Securities Corp.*, 556 F.2d 98 (2nd Cir.1977) (holding that secured loan agreements, under which an entity lends securities to a broker-dealer with whom it maintained no investment or trading accounts in return for cash collateral equal to market value of the shares, did not bear an indicia of a fiduciary relationship between a broker and its public customer; and finding that at best this relationship represented one between a debtor and a creditor.) *Id.*

■ In the case at bar, Ms. Josephs maintained three accounts with FIEC and was a customer with respect to other securities deposited in those accounts. However, the fact that Josephs is entitled to customer status in the course of some of her dealings with FIEC does not "confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute." *In re Stalvey & Assocs., Inc.*, 750 F.2d 464, 471 (5th Cir.1985). The securities at issue here were clearly transacted outside of Josephs' customer accounts.

■ From the record in evidence, Helen and Bonnie Josephs "delivered" various securities to FIEC and the Goettlichs for a number of years in return for 4% interest per annum above the bond coupon rate. The question is whether such an agreement constitutes a loan. If, as Ms. Josephs contends, FIEC was holding the bonds in safekeeping, it is unlikely that FIEC would pay her interest above the bond rate. Although the record does not contain any formal written loan agreements or promissory notes memorializing the asserted loans at issue here, Ms. Josephs repeatedly stated in correspondence that she "loaned" the securities to FIEC and the Goettlichs and had Demand Notes executed by them. *See* Notice of Trustee's Determination of Claim, dated December 3, 1999, Exhs. C, D, E and F.[4]

On March 5, 1997, Ms. Josephs sent a fax to Joseph Luparella, FIEC's accountant, stating, "First Interregional and Richard Goettlich borrowed securities from me and paid me interest on the loans in addition to the base interest income. Following is their promissory note. I want to call the note due." Glas Cert., Exh. D–1. On March 6, 1997, Ms. Josephs sent a letter to Richard Goettlich and

---

4. The record also reflects that FIEC and Herbert Goettlich, its President, executed a $50,000 Demand Note on December 31, 1979 in favor of Bonnie Josephs, "with no interest, or at option and demand of payee, $50,000 par value NYS Housing Finance Agency 9% bonds due May 1, 2004 with all unpaid interest coupons." Glas Certification at Exh. F–1.

FIEC stating, "Please take notice that I hereby demand immediate return of the securities I loaned you pursuant to the promissory note that you delivered to me in February 1997 (copy enclosed)." *Id.,* Exh. D–11. On March 7, 1997, Ms. Josephs sent a letter to Herbert Goettlich and FIEC stating, "[a]s you know, Richard also promised I had no reason to be concerned about continuing to lend your firm securities for your leverage." *Id.,* Exh. 3, Exh. 58. Notably, on March 10, 1997, Ms. Josephs sent a letter to Richard Goettlich and FIEC which not only characterized the nature of her relationship with FIEC dating back to 1979, but characterized the nature of her mother's relationship with FIEC as well:

> Please take Notice that I hereby demand immediate return of the securities that I loaned to you and to First Interregional Equity Corp. pursuant to the promissory notes that you and First Interregional delivered to me in February 1997, July 1989, August 25, 1988, and December 31, 1979, copies enclosed; and I further demand immediate return of the securities that my mother Helen J. Josephs loaned to you pursuant to the promissory note that you and First Interregional delivered to her on January 18, 1980, copy enclosed. I am the Executor and sole beneficiary of my mother's estate. Delivery of the securities must be made to me personally at the above address.

Glas Cert., Exh. D–9.

A similar letter was sent to Herbert Goettlich and FIEC on March 7, 1997. That letter provided:

> Please take Notice that I hereby demand *immediate return of the securities that I loaned to you* pursuant to the promissory notes that you and First Interregional delivered to me in February 1997, July 1989, August 25, 1988, and

December 31, 1979, copies enclosed; and I further demand immediate return of the securities that my mother Helen J. Josephs loaned to you pursuant to the promissory note that you and First Interregional delivered to her on January 18, 1980, copy enclosed. I am the Executor and sole beneficiary of my mother's estate. Delivery of the securities must be made to me personally at the above address.

*Id.* Exh. D–10.

Various letters to Bonnie Josephs from Herbert Goettlich during this time period up to 1997 stated in pertinent part:

> We are holding the above bonds *in safekeeping for you at your request.* We will deliver the bonds to you immediately upon your oral or written demand thereto, together with all unpaid interest coupons (emphasis added).

Affidavit of John L. Manley P–6 at Exh. D (correspondence dated August 25, 1988); Exh. F (correspondence dated July 19, 1989); Glas Certification Exh. F–1 (correspondence dated December 31, 1979). [Emphasis added].

With regard to the securities at issue here (Securities 4, 5, and 6) and the $10,000 Par Value Puerto Rico bond, FIEC and Richard N. Goettlich sent a letter, with a handwritten date of January 15, 1997, to Ms. Josephs stating:

> We acknowledge receipt of your bonds as follows:
>
> $125,000 Par Value New York City
> 7.400% due 2/01/06
>
> $80,000 Par Value New York City
> 6.25% due 4/15/07
>
> $10,000 Par Value Puerto Rico I.M.E.P.C.
> 10.500% due 6/01/10
>
> $175,000 Par Value New York City
> 6.00% due 10/15/26

We are holding the above bonds *for our finance leverage use, at your request.* We will deliver the bonds into your safekeeping account immediately upon your oral or written demand therefor, together with all unpaid interest coupons.

We advise that on each coupon date, you will receive interest based upon your coupon rate plus 4% per annum.

Glas Cert., Exh. F–2. [Emphasis added].

Of particular note with regard to the January 15, 1997 correspondence is that it was signed by Richard N. Goettlich not only in his capacity as President of FIEC, but individually as well.

Ms. Josephs maintains that this correspondence dated January 15, 1997, which she received on February 15, 1997, reflects a change in the alleged safekeeping arrangement between the parties. This alleged safekeeping arrangement covered the bonds from the preceding seventeen years that she did not request. She maintains that the request was made unilaterally only weeks before the liquidation proceeding of FIEC began. (Tr. at 49).

Ms. Josephs maintains that while she is a sophisticated and well-educated person and lawyer, she is not sophisticated in investments and that her only investments were the bonds at issue here. (Tr. at 49). Ms. Josephs maintains that she followed what her mother had done and relied on the Goettlichs in maintaining her investments. (Tr. at 50). Ms. Josephs maintains that throughout this period, she understood that the bonds were delivered to the Goettlichs and FIEC to be held in safekeeping by them, *Id.* Ms. Josephs maintains that her use of the term "loan" in numerous correspondence and documents, particularly correspondence written in or around March 1997 to parties to the FIEC liquidation proceedings was used in

an informal way to describe the arrangement. (Tr. at 70).

Ms. Josephs testified as follows:

And it is true that I used the word "loans" rather frequently with respect to the bonds that First Interregional was holding in safekeeping for me.

My use of that word, despite that I'm a lawyer and all, was an informal use from my point of view of that word. It meant that I gave the bond physically, and they're holding it for me; and that at least in the early days back in 1979, I asked for a promissory note from Mr. Richard—Herbert; but subsequently, I didn't have a promissory note.

It was an informal use of that word; but it refers, in my understanding, to this arrangement which was, as far as I understood it: I'm taking the bonds B

THE COURT: You said you did or you didn't have a prom—

THE WITNESS: There was one promissory note all the way back, and it's the last affidavit; and that relates to securities that are not here.

Subsequently, there was no such promissory note; but it was my understanding which—when I used those words, what I was talking about was what we did use. I was holding the bonds personally, physically, which made me feel secure I knew what they were.

BY MS. JOSEPHS:

(Continuing): I would go to the safe and cut the coupons, deposit them whenever they came due.

That was physical that I understood. That was what I understood in my rudimentary understanding of securities transactions.

When I delivered these valuable bearer bonds, which were like cash to First Interregional, that reduced my security

and increased my risk and we made this arrangement that they paid me an additional 4 percent.

That is what I was referring when I used the word "loan," and I have used it.

I used it in some handwritten notes that I have disclosed of conversations that I had with Richard Goettlich. I used it in letters that I wrote after the liquidation became known to me.

I wrote to lots of people, because I was frantic about where were my bonds, and what was going to happen with those.

I also invested in the leases. You may know that.

About six hundred thousand was invested in fraudulent leases that were sold to me by Richard Goettlich; and at the end, my claim was about two hundred and twenty thousand. Of that, I'm said to be recovering about 40 percent of that; . . .

I sent letters to everybody I could think of to find out, to get my bonds back.

Now, in some of those letters, I did—I did say that First Interregional may have delivered them to somebody else. By that time, I was worried, because I wasn't getting them back.

This is all within a couple of weeks of learning about the liquidation.

But in others of those letters,—and all of them are in evidence—in Exhibits 2 and 3 and 4 and 5, some of them, I say: Where are my bonds? Maybe the F.B.I. has them. Maybe the U.S. Attorney has them. Maybe they were on the premises, and they're still stuck there. Maybe he gave them to somebody else. I want to know where they are.

And some of them, I said, maybe they used for finance leverage use; and when I said that, I probably was looking at

that last document; dated January 15th, where that term was used, but I didn't know then what would—I know now.

So that explains my use of the word "loan," and there it is.

(Tr. at 70–73).

Ms. Josephs' contention that FIEC unilaterally changed a long term safekeeping arrangement is at odds with the evidence, particularly Ms. Josephs' letter to Richard Goettlich dated March 10, 1997 and letter dated March 7, 1997 to Herbert Goettlich, which shows a lending relationship existed as far back as 1979.

The Trustee asserts that the bonds were not delivered "for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting a transfer." 15 U.S.C. § 78lll(2); see also In re John Muir, 51 B.R. 150, 152–53 (Bankr.S.D.N.Y. 1985) (holding that broker's customer, the short seller, was not a "customer" of debtor-broker solely because broker had borrowed stock to cover the short sale, and that the Bankruptcy Court would not authorize a closeout of the loan transaction under SIPC rule). The Trustee argues the bonds were used only in connection with the loan agreement and not in connection with any market transactions. As such, the Trustee argues Ms. Josephs is not entitled to customer status.

The Trustee cites to In re Brittenum & Assocs., Inc., 82 B.R. 64 (Bankr.E.D.Ark. 1987) as an analogous case. Brittenum involved individuals induced to loan securities to Jon R. Brittenum, the 100% shareholder of the debtor Brittenum & Associates, Inc., a securities dealer. See id. at 65. Mr. Brittenum personally executed promissory notes that would pay the individual lenders 12% interest per annum in addition to the interest payable from the securities. In return, Mr. Brittenum re-

ceived an assignment enabling him to freely negotiate the securities, which he immediately assigned to his brokerage firm. *See id.* at 66. Mr. Brittenum's brokerage firm [the debtor] maintained physical custody of the securities pursuant to an agreement that they would be returned upon demand. *See id.* As the securities matured, the lenders would replace them with new securities. *See id.* No customer accounts were created with Brittenum & Associates and the firm's books and records did not reflect that the securities were ever held in a customer safekeeping account. *See id.*

In finding the lenders were not entitled to customer status, the *Brittenum* court stated, [t]he transactions between the [individuals] and the [broker] did not relate to investment trading or participation in the securities market on the [individuals'] behalf. The [individuals] agreed to transfer the securities to Brittenum for a fixed return ... The [individuals] were investors in the sense that they invested in the debtor, through its sole shareholder in the form of loans. But the [individuals] did not invest through the debtor, and, therefore, no fiduciary relationship was created which could afford them SIPA protection. *In re Brittenum & Assocs.*, 82 B.R. 64, 67. The bankruptcy court further stated, "[t]he fact that the [individuals] were unsophisticated in securities matters and were misinformed by Brittenum is unfortunate, but it is not relevant to the issue of whether they were customers of the debtor; the nature of the transactions determines customer status." *Id.*

Ms. Josephs argues *Brittenum* is distinguishable because it involved a solicitation for lenders and the lending agreement utilized written promissory notes authorizing the broker to assign the securities. Ms. Josephs further argues that unlike the *Brittenum* lenders, she was not informed by the brokerage firm that it intended to assign the securities or that the securities would become part of the firm' capital, or that there would be any dependence on the broker' solvency for return of the securities in question.

This Court finds the instant facts analogous to those in *Brittenum.* Like the *Brittenum* lenders, Ms. Josephs testified she was unsophisticated in securities matters and was misinformed by her broker. The evidence clearly shows that Ms. Josephs maintained a long-term agreement with FIEC and the Goettlichs whereby Ms. Josephs would deliver bearer bonds to FIEC in return for enhanced interest payments. Ms. Josephs testified she never agreed to a lending arrangement with FIEC and/or the Goettlichs, and that no promissory notes exist as to the alleged loans. However, correspondence between Ms. Josephs and various entities and individuals involved in the liquidation strongly suggest that Ms. Josephs believed she had loaned the securities to FIEC and/or the Goettlichs. Moreover, Ms. Josephs testified that although unsophisticated in securities matters, she was aware that bearer bonds are essentially "money," and that there was enhanced risk in turning over physical custody of the bearer bonds to FIEC and the Goettlichs without obtaining a receipt. (Tr. at 90). Ms. Josephs testified:

> All I did is what I'm saying I did, which is: I delivered the bonds physically, which it did, to some extent, increase my risk; and I got that promise through them, and they paid me the coupon rate and additional money.

(Tr. at 73).

Ms. Josephs' risk was offset by the extra 4% interest she received over the coupon value in much the same way the *Brittenum* lenders risk was offset by the extra 12% interest per annum they received in

addition to the interest payable from the securities. The fact that the *Brittenum* lenders memorialized their agreement in writing does not change the analysis. Here, the Josephs/FIEC agreement dates back at least until 1979, and possibly reaches back to the early 1970's with regard to the relationship between Helen Josephs and Herbert Goettlich. Helen and Bonnie Josephs were both aware of the 4% interest premium FIEC paid in return for physical possession of their bearer bonds and accepted this as compensation for the enhanced risk. Ms. Josephs offers no logical alternative as to why FIEC would pay 4% interest per annum over and above the coupon rate to rebut the Trustee's argument that the 4% interest premium represents interest on a loan. Ms. Josephs only response is that the agreement originated between her mother and Herbert Goettlich, and she simply followed her mother's pattern of investment activity. Ms. Josephs admits she now finds it "odd" that a securities company would pay 4% interest over the coupon interest rate for bonds held in a safekeeping account and could offer no economic reason why a brokerage would so act. (Tr. at 87–88).

Because the bonds were not reflected in any of her customer accounts, and because Ms. Josephs admits being aware of and receiving interest payments above the coupon rate, this Court concludes the nature of the Josephs/FIEC/Goettlich relationship is analogous to the lender/broker relationship in *Brittenum*. Additionally, this Court finds that Ms. Josephs does not meet the elements of the "Customer" definition set forth under SIPA. Here, the delivery of the bonds at issue was unrelated to FIEC's ordinary business of buying and selling securities for its customers. The evidence shows the bonds were delivered as loans to FIEC and/or the Goettlichs in return for 4% interest per annum

over and above the coupon rate. *See, e.g., In re Brittenum*, 82 B.R. 64, 67; *see also SEC v. F.O. Baroff Co.*, 497 F.2d 280, 284 (2nd Cir.1974) (holding that that claimant who had lent shares to brokerage firm in order to help it out of a cash bind, who did not have an open account with the firm, who did not receive benefits of loan secured by the stock, and who did not intend to use the stock as collateral for margin purchases was not a "customer" within meaning of the Act and thus was not entitled to its protection).

Ms. Josephs argues her claim with respect to Security # 4, NYC B/E $175,000.00 at 6.00% per annum, due 10/15/2026, is in fact a cash claim. As noted above, Ms. Josephs asserts FIEC redeemed $175,000.00 worth of Urban Development Corporation (UDC) bonds and deposited the cash in her reserve account. Ms. Josephs further asserts that she directed FIEC to purchase the bonds listed above as Security # 4 with this money. Ms. Josephs argues that because FIEC's records do not reflect the purchase or registration of $175,000.00 worth of NYC/BE bonds on her behalf, her claim for Security # 4 is really a cash claim for monies deposited in her reserve account. Ms. Josephs makes a similar argument with regard to the $10,000 cash claim for the redeemed Puerto Rico Security. In short, Ms. Josephs asserts a cash claim of $185,000 based on FIEC's alleged failure to purchase securities as directed.

The Trustee argues that FIEC held the redeemed UDC notes under terms of what was clearly the lending arrangement that dated to 1988. Noting that Ms. Josephs admits she intended to reinvest the proceeds in another security, the Trustee asserts the new security would remain part of the lending arrangement. The Trustee further asserts the proceeds from the re-

deemed Puerto Rico security would be reinvested and utilized in the same way.

Ms. Josephs cites *In re C.J. Wright & Company, Inc.*, 162 B.R. 597 (Bankr. M.D.Fla.1993) in support of her argument regarding her cash claim and Securities # 4, # 5 and # 6. In *C.J. Wright*, the trustee denied eleven claimants customer status and classified their claims as general creditor claims. *See id.* at 599. The claimants deposited monies with the broker to invest in certificates of deposit through the broker. *See id.* at 601. After opening deposit accounts, the investors received signed documentation stating (a) the amount invested; (b) the term of the investment; (c) the fixed interest rate to be paid; and (d) a penalty for early withdrawal, among other things. *See id.* Analyzing the facts, the court found the deposit account transactions were similar to loan transactions. *See id.* at 605. However, the court found the imposition of a penalty for early withdrawal inconsistent with the making of a loan. *See id.* at 606. Additionally, the court found the investors did not intend to loan money to the debtor. *See id.* The court, however, did find the transactions consistent with purchasing CDs. *See id.* Based upon a finding that CDs are securities and that the claimants did not intend to loan money to the debtor, the court found the investors entitled to customer status. *See id.* at 609.

The Court finds *C.J. Wright* distinguishable on the facts. Moreover, while a debtor broker's failure to deposit securities in a customer account and the debtor broker's subsequent characterization of the original transaction between the customer and broker-dealer may not alter the character of the transaction to defeat customer status, *see, e.g., In re Gibralco Inc.*, 53 B.R. 324 (Bankr.C.D.Cal.1985); *Matter of Investors Security Corp.*, 30 B.R. 214 (Bankr. W.D.Pa.1983), such are not the facts here.

Here, the evidence shows a pattern of activity on the part of Ms. Josephs to lend certain securities to FIEC and the Goettlichs in return for 4% per annum interest above the coupon rate. When a bond became due, FIEC would redeem the bond and reinvest the proceeds in another security subject to the same lending agreement. Notably, the bonds and securities subject to the lending agreement never appear in Ms. Josephs' various customer accounts. It is clear that the nature of Ms. Josephs' relationship with FIEC and the Goettlichs with respect to the securities at issue was creditor/debtor rather than customer/broker.

Accordingly and for the reasons stated above, this Court finds that with respect to Securities # 4, # 5, # 6 and the credit claim, the nature of the transactions among Ms. Josephs, FIEC and the Goettlichs was that of a creditor/debtor. Ms. Josephs was a lender of securities to the broker and thus is not entitled to customer status under SIPA. Therefore, the Trustee's Motion for Affirmation of His Determination of Claim is GRANTED.

**5. Josephs' Assertion of a Late Claim.**

At the April 20, 2001 hearing, Ms. Josephs sought to assert a customer claim with respect to $35,000 par value Municipal Assistance Corp. bonds ("MAC Bonds"), bearing interest at 10.75%, due 7/1/00. 15 U.S.C. § 78fff–2(a)(3) provides in relevant part:

No claim of a customer or other creditor of the debtor which is received by the trustee after the expiration of the six-month period beginning on the date of publication of notice under paragraph (1) shall be allowed, except that the court may, upon application within such period and for cause shown, grant a reasonable, fixed extension of time for the filing of a claim by the United States, by a State or

political subdivision thereof, or by an infant or incompetent person without a guardian....

As noted above, publication of notice under § 78fff–2(a)(1) was made on May 19, 1997. It is undisputed here that Ms. Josephs received notice of the Bar Date in this matter and filed a timely Proof of Claim on June 26, 1997.

The six-month time bar contained in § 78fff–2(a)(3) of SIPA is mandatory and absolute. *In re Blinder, Robinson & Co., Inc.*, 124 F.3d 1238, 1243 (10th Cir.1997); *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 103 (Bankr.S.D.N.Y. 1977). The Court's discretion to extend the six-month period is limited to requests made within the statutory six-month period by specified parties and for cause specified in the statute. *Adler, Coleman, supra*, 204 B.R. at 103; *Matter of Weis Securities*, 411 F.Supp. 194 (S.D.N.Y. 1975), *aff'd without opinion* 538 F.2d 317 (2d Cir.1976). The statute does not permit equitable relief. *Id.* Both the SIPA Trustee and SIPC object to Ms. Josephs' assertion of a late-filed customer claim. Here, the SIPA trustee and SIPC argue that the claimant is neither an infant nor incompetent person without a guardian. And further, that claimant has not timely moved to extend the six month period.

This Court agrees and holds that Josephs' customer claim with respect to the MAC Bonds must be denied. We will not consider the claim an "amendment" to the original filing. Amendment to a claim is freely allowed where the purpose is to cure a deficit in the claim as originally filed, describe the claim with greater particularity, or to plead a new theory of recovery on facts set forth in the original claim; an amendment is not allowed to assert an entirely new claim. *See e.g., In re Brown*, 159 B.R. 710, 714 (Bankr.D.N.J.1993); *In re Drexel Burnham Lambert Group*, 151 B.R. 684, 694 (Bankr.S.D.N.Y.1993); *In re Metro Transportation Co.*, 117 B.R. 143, 147 (Bankr. E.D.Pa.1990). Amendments after the bar date must be scrutinized carefully to ensure that they are truly amendments to a timely filed claim and not asserting a new claim. *Id.* Ms. Josephs' claim for the subject bonds is not an amendment to the June 26, 1977 claim to correct a deficiency in the claim for the Bonds already made, but the assertion of a new claim for new bonds. *See SEC v. Provident Securities*, 3 B.C.D. 1369 (Bankr.S.D.N.Y.1978) ("the purchase of each security was a separate, distinct transaction such that later asserted claim was not an amendment as it did not relate to the claim for seven other securities in the original claim"). Ms. Josephs argues that the original claim was timely filed and should be construed to include a security that the debtor in fact had been holding for the claimant in safekeeping, but which security the debtor had converted and concealed from the claimant. The strictness of the limitations period is illustrated by the fact that even if the customer is affirmatively misled as to filing requirements, no exception can be made unless permitted by statute. *See Miller v. Austin*, 72 B.R. 893, 896–97 (S.D.N.Y. 1987). Ms. Josephs had notice of the SIPA Liquidation Proceeding and ample time to conduct an accounting of her own holdings and investments in the case at bar. The administration of SIPA claims should not be delayed herein.[5]

---

**5.** To the extent that Ms. Josephs wishes to pay the debit balance of $49,570.91 with respect to security # 2, the Trustee asserts that Ms. Josephs may not do so at this late date based on the court approved instructions for completing Customer Claim forms. *See* Reply Memorandum of Law in Support of Trustee's Motion dated January 29, 2001 at P. 5–6.

## CONCLUSION

Accordingly, the Trustee's Motion to Affirm the Trustee's Claim Determination on a claim filed by Ms. Josephs is GRANTED and Ms. Josephs' assertion of a late SIPA customer claim is DENIED. Ms. Josephs' request to pay the debt balance with respect to Security # 2 shall be the subject of further proceedings before this Court.

An order shall be submitted in accordance with this Opinion.

Ms. Josephs asserts that no demand for payment of the balance due was made on her by the Trustee after the commencement of the SIPA proceedings. *See* Certification of Bonnie P. Josephs, dated January 19, 2001 at ¶ 4. The Trustee contests this assertion. The record in this case is insufficient to allow the Court to rule on this issue. A further hearing on this limited issue shall be held by the Court on *April 9, 2003 at 10:00AM.*